**UNITED STATES of America,
Plaintiff,**

v.

**Richard Michael KING, aka Richard
Hansen, et al., Defendants.**

**Crim. No. 11627.**

United States District Court,
S. D. California.

Nov. 23, 1971.

Joseph Milchen, E. Mac Amos, Jr., Asst. U. S. Attys., Charles J. Fanning, Southwestern Unit, Narcotics and Dangerous Drugs Division, San Diego, Cal., Elizabeth Meyer, Southwestern Unit, Narcotics and Dangerous Drugs Division, San Diego, Cal., for the United States.

Michael S. Hegner, San Diego, Cal., for Richard King.

Kevin J. McInerney, San Diego, Cal., for Gordon Ardel Maack.

Douglas R. Reynolds, San Diego, Cal., for Paul A. Vesco, Jr.

William J. Zumwalt, San Diego, Cal., for John Ferris Pope.

William Brockett, San Diego, Cal., Federal Defenders, Inc., for Virginia Marie Pope.

Artie G. Henderson, San Diego, Cal., for Miki Dee Thieda.

Frank B. Gregorcich, San Diego, Cal., for James Russell Vukich.

Charles R. Khoury, Jr., San Diego, Cal., for Carole J. Swisher.

George W. Dixon, Tacoma, Wash., for Robert Craig Light.

Mobley M. Milam, San Diego, Cal., for John Fahlen.

Paul G. Evans, La Jolla, Cal., for James Leo Olson.

## MEMORANDUM OPINION AND ORDER ON PRETRIAL MOTIONS

NIELSEN, District Judge.

The defendants and moving parties were originally indicted by the Grand Jury on May 12, 1971. This indictment was in two counts, charging in Count 1 a conspiracy to conceal, transport and possess marijuana with the intent to distribute it, and in Count 2 the use of a communications facility in facilitating the commission of and attempting and conspiring to commit the offenses of importation, concealment and transportation of marijuana.

The Grand Jury returned a 30 count superseding indictment on July 12, 1971. In Count 1, all defendants are charged with conspiring to smuggle, transport, conceal and possess marijuana with the intent to distribute it. All remaining counts are charges of using a communications facility in facilitating commission of and attempting and conspiring to commit the offenses of importation, concealment and transportation of marijuana. In Counts 2, 3, 4 and 5, King is charged; in Counts 6, 7 and 8, Olson is charged; in Counts 9, 10, 11 and 12, Swisher is charged; in Counts 13 and 14, John Pope is charged; in Counts 15, 16, 17 and 18, Vesco is charged; in Counts 19 and 20, Vukich is charged; in Counts 21 and 22, Lordson is charged; in Counts 23 and 24, Fahlen is charged; in Counts 25, 26 and 27, Baldwin is charged; in Counts 28 and 29, Beth is charged; and in Count 30, Thieda is charged.

From the various pleadings, affidavits and the evidence adduced before this Court in the hearings on the pretrial motions, it appears that the prosecution is based primarily upon interceptions and recordings of telephone conversations over the telephone of defendant King in his apartment located at 2002 First Avenue, San Diego, California, between March 20, 1971 and May 3, 1971. These interceptions were carried out under authority of an order authorizing interception of wire communications issued on March 20, 1971, by Chief Judge Edward J. Schwartz of the Southern District of California upon application by the United States under the provisions of Title III, Omnibus Crime Control and Safe Streets Act of 1968, Chapter 119 of Title 18, United States Code, hereafter referred to as Title III. Extensions of the order were issued covering this entire period.

Portions of the telephone conversations so intercepted were incorporated into probable cause affidavits as the basis for search warrants issued for the residence of defendant King, as well as for the office of his accountant.

On May 3, 1971, as a result of the information developed by intercepted conversations in conjunction with other investigation and surveillance, the vessel *Mercy Wiggins* was boarded off the northern California coast, defendants Olson and Maack were arrested on the vessel, and 10,100 pounds of marijuana were seized together with the boat. At approximately the same time as that seizure, the vessel *Andiamo* was seized inside San Francisco Bay, and John and Virginia Pope were arrested aboard it. At approximately the same time, King, Light, Thieda and Vukich [the driver] were arrested in King's camper near the Golden Gate Bridge, and certain allegedly incriminating evidence was seized from Vukich's person in a search following

this arrest. Swisher was arrested later in San Diego; Fahlen much later in Hawaii; Lordson, Beth and Baldwin remain fugitives.

Motions of various kinds have been filed by all appearing defendants, and by order of this Court the motions originally filed in Criminal No. 11257 have been ordered transferred to and consolidated with the motions filed in this instant action. Also, by permission of this Court, King, Olson, Vesco, Vukich and Swisher have filed motions joining in all other defendants' motions.

The following motions are before the Court at this time:

1. Motions to suppress the wiretap evidence.

2. Olson's motion to declare the seizure of the vessel *Mercy Wiggins* and its cargo illegal and without probable cause.

3. Olson's motion for a change of venue.

4. King's motion to suppress the evidence seized under the search warrants for King's apartment and for the office of his accountant.

5. Vukich's motion to suppress the evidence seized from him at the time of his arrest.

6. Virginia Pope's motion to suppress statements made by her after her arrest.

7. Olson's motion for a severance and separate trial.

8. Olson's motions to dismiss Counts 6, 7 and 8.

9. King's motions to dismiss Counts 2, 3, 4 and 5.

10. Vukich's motion to dismiss Counts 19 and 20.

11. Virginia Pope's motion for a severance.

12. Maack's motion to require the Government to elect in Count 1 as to which conspiracy it is going to rely upon, claiming that a single conspiracy is charged to violate three separate laws.

13. Vesco's and Thieda's motion to dismiss for failure to record the Grand Jury proceedings.

14. Virginia Pope's motion for an order disclosing the identity of the informer, in which all defendants have orally joined.

15. King's motion to declare the pen register illegal.

I

**MOTIONS TO SUPPRESS EVIDENCE OBTAINED THROUGH ELECTRONIC SURVEILLANCE**

It is apparent that the primary target of defendants' pretrial motions in this case is the electronic surveillance of King's telephone, authorized by judicial order pursuant to 18 U.S.C. § 2518.

The attack, in which all defendants have joined, is mounted on six bases: first, that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, the statute which provides for the interception of wire communications, is constitutionally invalid on its face; second, that the affidavits presented to Judge Schwartz in support of the Government's application for a wiretap order were insufficient under the statute; third, that the authorizing order itself was overbroad and therefore not in compliance with statutory requirements; fourth, that the Government agents who executed the order failed to adhere to its provisions; fifth, that the privilege inhering in the attorney-client relationship was violated; and sixth, that the brief presence of a San Diego County Deputy Sheriff during the wiretap renders the entire surveillance invalid. This Court cannot agree that any of the foregoing objections are sufficient in the circumstances of this case to warrant complete suppression of the evidence so acquired.

A. *The Constitutionality of the Statute*

The constitutional challenge to Title III centers on Section 2518 of 18 U.S.C., which establishes the procedure for the interception of wire or oral communications. Defendants contend that this sec-

tion violates the Fourth Amendment prohibition against unreasonable searches and seizures in that it authorizes electronic surveillance without providing adequate safeguards to personal privacy.

This argument has been raised in other districts which have adjudicated cases involving Title III wiretaps. See United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla. 1970); United States v. Scott, 331 F. Supp. 233 (D.D.C.1971). In every opinion thus far reported the statute has been held valid on its face as following closely the "guidelines" for electronic surveillance set forth by the United States Supreme Court in the pre-statute cases of Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

Having reviewed the statute in the context of these decisions as well as the intent of Congress, this Court reaches a like conclusion. It is not in dispute that general, exploratory electronic searches are not permissible under the Fourth Amendment, but Section 2518 appears to have been drawn with the specific purpose of eliminating such a possibility in the narrowly circumscribed system it creates. Under Section 2518 a wiretap may be effected only when a federal judge determines there is probable cause to believe a specific offense has been, is being, or will be committed, and that telephonic communications will reveal pertinent information. There are other precautionary measures; among the most important: the communications to be intercepted must be specifically described; normal investigative procedures must be shown to be inadequate or inappropriate; the duration of the wiretap must be strictly limited; efforts must be made to minimize the interceptions which do not relate to the subject matter of the investigation; and frequent progress reports must be made to the authorizing judge.

It is therefore the finding of this Court, in accord with the district judges in *Sklaroff, Escandar,* and *Scott, supra,* that the provisions of Section 2518 meet the requirements of specificity, narrowness, particularity, and judicial supervision set out in *Berger, Katz,* and *Osborn,* and that they represent no invasion of Fourth Amendment rights. All motions based on the unconstitutionality of Title III are consequently denied.

### B. *Sufficiency of the Application for Wiretap Authorization*

Defendants move to suppress the wiretap on the ground that the Government's application for authorization to institute electronic surveillance was defective under 18 U.S.C. § 2518(1), and the interception therefore invalid. The challenge in this regard is multi-pronged.

#### 1. Hearsay on Hearsay

One major contention, set forth by defendant Swisher and joined in by the other defendants, is that there was no probable cause for the interception of wire communications as required by Section 2518(3) of the statute. The basis for this contention is that the order authorizing the wiretap was granted on the strength of the sworn affidavit of Senior Resident Agent Paul V. Martin of the United States Customs Service, a document which contained information from an unnamed individual supplied not to Martin personally, but to San Diego County Deputy Sheriff Dennis Bellon, who alone knew the informant's identity. Because Martin thus had no personal knowledge of the informant's credibility or the reliability of his information, defendants contend that the standards of personal knowledge and reliability, as set forth in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), were not met.

That hearsay information may be the basis of a search warrant is well-established. See Jones v. United States,

362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The question now before this Court is whether a warrant issued by a magistrate on the basis of "hearsay upon hearsay" is valid.

The question of so-called "double hearsay" was dealt with by the Seventh Circuit in United States v. Roth, 391 F.2d 507 (7th Cir. 1967), in which "inherently defective hearsay on hearsay" is defined as "hearsay on hearsay as to which there is absent any indication of the reliability of the anonymous hearsay source. * * *" 391 F.2d 507, 511. It appears clear that *Roth* does not condemn double hearsay in a context where, as here, the information in the affidavit vouched for the reliability of the anonymous informant. (See page 5 of Agent Martin's affidavit.)

Two recent district court cases have also dealt with the question of double hearsay. In United States v. Carney, 328 F.Supp. 948 (D.Del.1971), the United States District Court for Delaware held that nothing in *Spinelli, supra,* condemns outright an affiant's reliance on a tip from an informer who does not himself have personal knowledge of the information he provides.

In that case a bank security officer supplied an FBI agent with facts establishing probable cause to believe the defendant was depositing and drawing on stolen checks. On the basis of this information the defendant and others were arrested and a search warrant obtained. The bank officer had obtained much of the information he related to the agent from a Pennsylvania finance corporation. Therefore this information, as it appeared in the agent's affidavit, constituted double hearsay. It was nevertheless upheld on the ground that "the specificity and detail of information which may be double hearsay may itself vouch for the reliability of the information, at least where, as here, it is confirmed by that which the law enforcement officers later observe." 328 F. Supp. 948, 958.

Likewise, in United States ex rel. Crawley v. Rundle, 312 F.Supp. 15 (E.D.Pa.1969), the court held that a search warrant issued on the affidavit of a detective who received his information from unnamed police officers who in turn received their information from an undisclosed informant who witnessed the burglary was valid. Noting that if the two unnamed policemen who received the information had acted as affiants, there would have been no question of validity, the court stated that the introduction of a third party did not alter the situation. Stated the court:

"It would be overly burdensome to impose the requirement that the same law enforcement official who received information from an informant must apply for any search warrant sought. Unnecessary administrative problems would result. * * * Further, where there is no allegation of bad faith on the part of the law enforcement officials involved, there is no reason to discredit information passed from one official to another before being offered to a magistrate as grounds for probable cause." 312 F.Supp. 15, 18.

This Court finds the reasoning of these cases persuasive, and therefore holds that the affidavit of Paul Martin was not defective on account of being hearsay on hearsay.

### 2. Use of Long Distance Toll Records

Defendants Thieda and Vesco attack Paragraph 27 of Martin's affidavit. This paragraph recites the existence of toll records obtained from the Pacific Telephone Company reflecting several long distance and maritime calls from defendant King's telephone. It is argued that the information obtained from these toll records must be suppressed as being violative of 47 U.S.C. § 605 and an unwarranted invasion of privacy, and thus can not be considered in evaluating the probable cause requisite to obtaining a wiretap order. From this, defendants conclude that all evidence obtained via electronic surveillance must be suppressed because withdrawal of the toll

record information would be fatal to the application.

The Government's initial objection to movants' standing on this question is obviated by the fact that King joined in this as well as all other motions filed in this cause.

■ All parties agree that the revealing of toll records maintained by administrative and accounting personnel employed by a telephone company would be covered, if at all, by the second part of Section 605. See Bubis v. United States, 384 F.2d 643, 647 (9th Cir. 1967); United States v. Covello, 410 F.2d 536, 541 (2d Cir. 1969), cert. denied 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969). Section 605 has been amended since Bubis, and more recent decisions indicate that the first phrase is applicable and one who monitors lines to compile toll call data is a "person receiving, assisting in receiving, transmitting or assisting in transmitting" a wire communication. Nolan v. United States, 423 F.2d 1031, 1043–1045 (10th Cir. 1969); DiPiazza v. United States, 415 F.2d 99, 101–102 (6th Cir. 1969), cert. denied 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); United States v. Covello, 410 F.2d at 541; Hanna v. United States, 404 F.2d 405, 408 (5th Cir. 1968).

Language in Bubis appears to support movants' position, but this Court finds that case factually distinguishable. The defendant there had been utilizing an electronic device to by-pass telephone company record-keeping equipment. This gave him unlimited free use of long distance trunk lines for purposes of transmitting wagering information. The telephone company monitored his line for three months and then the tapes made were given to the United States Attorney. Defendant was indicted and convicted of unlawful interstate transmission of wagering information. The Ninth Circuit constructed a theory of implied consent of the telephone subscriber to monitoring reasonably necessary to determine if telephone use violates subscription rights. The conviction was reversed, however, because the monitoring was excessive; ample evidence of unlawful use was obtained within three days after monitoring commenced. In footnote 5 at page 648 of 384 F.2d, the court intimates that disclosure might be prohibited even if the monitoring had been properly limited. This is so since disclosure under the second part of Section 605 is limited by the implied consent to that necessary to aid the telephone company in collecting tolls and inhibiting future conduct by others.

In Covello, 410 F.2d at 541–542, the Second Circuit allowed telephone company toll records into evidence. They were found to be maintained as a necessary part of the ordinary course of business. Subscribers are fully aware that such records are maintained. Section 605 was held to be no evidentiary bar to records made in the ordinary course of business which are essential to the daily functioning of that business, and toll records are entitled to the same evidentiary treatment as any other business record.

The Sixth Circuit agrees that the routine maintenance of toll call records is not an interception of communications prohibited by Section 605. DiPiazza v. United States, 415 F.2d at 101–102. After finding that the maintenance of toll records would fall within the first clause of Section 605, the court went on to hold that disclosure was authorized on demand of lawful authority. Lawful authority was found to exist in an Internal Revenue Service investigative summons issued by an Internal Revenue Service agent without judicial participation.

■ This Court finds that toll records, maintained by Pacific Telephone Company in the ordinary course of business, were properly disclosed upon request by a special agent of the United States Customs Agency Service, Treasury Department, as part of an on going criminal investigation, and that such request was a "demand of . . . lawful authority" within the meaning of Section 605.

■ Movants further argue that disclosure of these toll call records was an invasion of privacy prohibited by the Fourth Amendment and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). While certain broad language in *Katz* may appear to be supportive of movants' position, this Court prefers to adopt the dictum in DiPiazza v. United States, 415 F.2d at 103–104. One seeking privacy may assume that his statements will not be intercepted, except under proper warrant, but he is not entitled to assume that the fact of making the call will remain a secret to be disclosed only pursuant to a search warrant. See also, Nolan v. United States, 423 F.2d at 1044. No Fourth Amendment right of the moving parties was violated in obtaining the toll records.

This Court holds that the toll records were properly obtained by the Government and were usable as a basis for the wiretap authorization. The motions to suppress on this ground are denied.

### 3. Other Investigative Procedures

A third major allegation of all the defendants is that Agent Martin's affidavit failed to comply with Section 2518 (1) (c), which requires that the affidavits in support of the wiretap authorization demonstrate that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

On page 12 of his affidavit, Agent Martin states at Paragraph 30:

"Normal investigative procedures will not result in government agents keeping abreast of the movements of the vessel Mercy Wiggins or in securing information as to the pickup and transportation of marijuana by that vessel between Mexico and this country. There is no way in which government agents can conduct a surveillance of the movements of that vessel during a lengthy voyage to Mexico and back to this country without detection by the subjects under surveillance, nor is there any way of learning where and when that vessel will arrive in this country with marijuana except by the proposed electronic surveillance."

It is urged upon us by defendants that this statement merely parrots the words of the statute and is too conclusionary to fulfill its requirements. It is true that the statement is brief, and the Government might have been well-advised to include a more detailed summary as to the inadequacy of other investigative techniques. However, it appears obvious to this Court that in the particular circumstances of this case, where the boats were more than one thousand miles below the border, normal techniques for tracking the boats were either physically impossible (radar) or would be easily detected by the subjects (aerial surveillance).

■ The purpose of Section 2518(1) (c) is to inform the authorizing judge of the difficulties inhering in the use of conventional techniques. Since the peculiar nature of this case, involving as it does an allegedly large-scale conspiracy with many members in many locations, serves to make these difficulties self-evident, Paragraph 30 of Agent Martin's affidavit seems a reasonable, if not artful, compliance with the statute. "In matters of this kind substantial compliance is all that is required." United States v. Freeman, 144 F.Supp. 669, 670 (D.D.C.1956).

For this reason, motions to suppress evidence on the basis of failure to show sufficient necessity for the wiretap under Section 2518(1) (c) are denied.

### 4. Reliability of Anonymous Informant

Defendants also allege that the application for the intercept authorization is defective in that Agent Martin failed to verify the reliability of the informant. Consequently, they contend, the order is invalid under *Aguilar* and *Spinelli, supra,* as based on insufficient probable cause.

■ This argument is without merit. This Court has already concluded that

the double hearsay issue does not vitiate the application; therefore, the fact that the reliability of the anonymous informant was known to another law enforcement officer who relayed the information to Martin, rather than known to Martin himself, should not have that effect either. Assuming the reliability of Deputy Sheriff Bellon, this Court finds that adequate information was furnished in Paragraphs 10–18 and 20–26 of the affidavit for Judge Schwartz to have determined independently the validity of the informant's conclusion as well as the credibility of the informant himself.

The informant made statements to Deputy Bellon concerning the maritime smuggling activities of defendant King, who, it is alleged in the affidavit, had been under suspicion as a suspected smuggler by the Customs Service since June of 1970 (page 9 of the affidavit). The informant stated that on a previous occasion the vessel *Andiamo* had been used by King for the illegal importation of marijuana, and Agent Martin not only had knowledge of a prior boarding of that vessel by the San Diego Harbor Police (page 9 of affidavit), but had boarded it himself and detected a strong odor of marijuana as well as a small amount of marijuana debris (page 10 of affidavit). On two occasions King had been found aboard.

A detailed analysis of the affidavit reveals a situation analogous to that in United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), which upheld the sufficiency of an affidavit by an FBI agent which alleged his own knowledge of the defendant's reputation as well as an oral tip from an unnamed informant. In the case now before this Court, the Customs Service already had suspicions about King which, when coupled with the detailed information supplied by the informant, was sufficient to establish probable cause for the intercept order. As the Supreme Court stated in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965):

"[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. * * Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." 380 U.S., at 108, 85 S.Ct., at 746.

As to the reliability of the informant, in *Harris, supra,* the mere allegation that the informant was "prudent," when coupled with the information furnished and the Government's own knowledge, was held sufficient to meet the standard of reliability set forth in *Spinelli, supra.* Accordingly, this Court finds that since in the present case Agent Martin's affidavit cites prior instances of the informant's reliability as well as his involvement with King, clearly a declaration against interest, credibility is amply established.

All motions for relief based upon the unreliability of the anonymous informant are denied.

5. Reliability of Deputy Sheriff Bellon

Defendants also seek to have the application found wanting because Agent Martin's affidavit does not contain a statement of the reliability of Deputy Sheriff Dennis Bellon, the direct recipient of the informant's tip. The Court finds this argument specious.

■ Deputy Bellon cannot be considered an "informant" in the same sense as the person from whom he received his information. Rather he is a county law enforcement officer, well-known to courts, prosecutors and defense attorneys on both the state and federal sides of justice in the San Diego area. The Supreme Court has stated that free and open cooperation between state and federal law enforcement officers is to be commended and encouraged, Elkins v. United States, 364 U.S. 206, 80 S.Ct.

1437, 4 L.Ed.2d 1669 (1960), and surely, to require that an affidavit in support of a search warrant contain an allegation and proof of the reliability of a fellow officer would hardly foster this end. Instead, it would be a needless burden, and precisely the kind of "elaborate specificity" condemned by the Supreme Court in *Ventresca, supra.* This Court can only reiterate its agreement with Judge Body of the Eastern District of Pennsylvania, who stated that "where there is no allegation of bad faith on the part of the law enforcement officials involved, there is no reason to discredit information passed from one official to another before being offered to a magistrate as grounds for probable cause." United States ex rel. Crawley v. Rundle, 312 F. Supp. 15, 18 (1969).

Motions to suppress evidence based on the affidavit's failure to allege the reliability of Deputy Sheriff Bellon are denied.

### 6. Need for Extension Orders

A final point regarding the sufficiency of the application for intercept authorization is raised by defendant King. His argument is that since Section 2518(5), providing for extension of the wiretap, requires that the provisions of Section 2518(1) be met anew, the Government's applications, which incorporate the original affidavits, are inadequate.

It is clear from the progress reports that the information which the wiretap was designed to elicit, i. e., the date, time and place of the *Mercy Wiggins'* arrival in this country with contraband aboard and the identity of all the members of the conspiracy, had not yet been revealed during the initial twenty days of interception. Therefore, the reasons which supported the original authorization, if adequate in the first instance, remained compelling, and the fact that the supporting affidavits were incorporated into the extension application rather than being redrafted is of no consequence.

Any motion to suppress based on the inadequacy of the applications for extension orders is denied.

Clearly, some of the objections raised by defendants with regard to the Government's application may bear consideration. However, for the purposes of this case, this Court finds the application adequate under Section 2518(1) in all respects, and all motions based on its deficiency are denied.

### C. *Validity of the Authorizing Order*

This Court now directs its attention to the third major challenge to the legality of the wiretap of King's telephone, and that is the sufficiency of the order signed by Judge Schwartz on March 20, 1971. Defendants contend that the order is overbroad, giving Government agents license to conduct an electronic search which is general and exploratory in nature, and thus violative of both the Fourth Amendment and the mandate of the Supreme Court in Berger v. New York, *supra.* I have considered all the objections to the order and have found none of them persuasive.

### 1. Communications Sought to be Intercepted

First, defendants charge that the order was not specific enough in particularizing the types of wire communications which the Customs agents were authorized to intercept. An analysis of all the provisions of the order will reveal that such objection is without foundation.

Subsection (4) (c) of § 2518 requires that the order specify the particular type of communication sought to be intercepted. On page 2 of the order, authorization is given to Customs agents to intercept wire communications of Richard Michael King and others concerning the offenses described with particularity on page 1. Also on page 1, Judge Schwartz complied with Section (3) (b) of the statute, which requires that the authorizing judge find probable cause for the belief that particular communications concerning that offense will

be obtained through such interception, and in doing so, he described those communications as concerning (1) the date, time, and place of the loading of marijuana aboard the vessel *Mercy Wiggins* in Mexican waters, (2) the date, time, and place of the arrival of that vessel with marijuana in this country, and (3) the identities of confederates of King.

It is difficult to see what greater degree of specificity as to the communications could be achieved than these two provisions taken together. It is apparent that the agents were instructed by Judge Schwartz to intercept those conversations relating to the offense which would elicit the specified information. Furthermore, the order also includes, as required by the statute, the provision that the wiretap be conducted in such a way as to minimize the interception of communications not otherwise subject to interception, that is, not pertinent to the offense or the enumerated objectives.

It seems clear that the authorizing order, if considered in its entirety as it must be, does describe the types of communications to be intercepted in compliance with the dictates of 18 U.S.C. § 2518(4) (c).

### 2. Means of Minimization

■■■ The very presence of the provision requiring minimization of interceptions in the order gives rise to defendant's second objection, which is that the order is vague in that it fails to state how such minimization should be effected.

Judge Waddy in United States v. Scott, *supra*, deals with this precise question. At page 246 of 331 F.Supp., he states:

"Contrary to the contention of the defendants the statute does not require the Order to state *how* the agents are to minimize receipt of communications 'not otherwise subject to interception'; nor does the 4th Amendment prescribe such a requirement. It is sufficient for the Order to state

the requirement and direct the officer to carry out the mandate of that Order."

This Court is in complete accord with this interpretation, and finds that a challenge to the order on such a basis cannot be sustained.

Congress felt it neither wise nor necessary to prescribe particular means of achieving minimization within the four corners of the statute; obviously the imposition of a rigid set of rules might in diverse situations serve to thwart the very purposes of the statute. Similarly, for the authorizing judge to set up standards for minimization prior to the instituting of electronic surveillance, before the nature of the communications and the exigencies of the situation can be determined, might also have an adverse effect on the progress of the investigation. On the assumption that surveilling agents will comply with the mandate and devise appropriate means to effect minimization, a general provision such as the one included by Judge Schwartz does not serve to invalidate the order. Motions to suppress on this basis are denied.

### 3. Persons Subject to Interception

Defendants Vesco and Thieda also challenge the order for failing to specify the identities of those persons whose conversations were subject to interception. Section 2518(4) (a) of Title III requires that each order authorizing or approving the interception of any wire or oral communication shall specify the identity of the person, if known, whose communications are to be intercepted. The contention is that the affidavits in support of the order show probable cause to intercept the conversations of King alone, and that the order, apparently a grant to intercept the conversations of anyone at all using the tapped wire, is in effect a general search in violation of the provisions of the Fourth Amendment.

Defendants' argument gains support from the language of Berger v. New York, *supra*, in which the Supreme Court

invalidated a New York statute authorizing general eavesdrops. In that case the Court stated:

"It is true that the statute requires the naming of the person or persons whose communications, conversations or discussions are to be overheard or recorded. * * * But this does no more than identify the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized. As with general warrants this leaves too much to the discretion of the officer executing the order." 388 U.S. 41, 59, 87 S.Ct. 1873, 1883.

From this it may be inferred that specifically naming the persons whose conversations are to be intercepted is a minimum requirement of particularity, and that a provision which requires that the Government need specify only those persons whose names they already know allows warrants which are overbroad in scope. If this argument were sustained, the conversations could be used against King alone.

This problem arose in United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla. 1971), where defendants not specified by name in the wiretap authorization order moved that their intercepted conversations be inadmissible against them. Noting that there was no legal precedent on the issue, Judge Cabot declined to make the requested ruling on the ground that it would render Title III virtually worthless. Said the court:

"I do not believe that any such illogical and one-sided application of Title III was contemplated by Congress. This belief finds support in 18 U.S.C. § 2518(9) providing in part that the contents 'of any intercepted wire or oral communication' may not be received in evidence 'unless *each* party' has been furnished with a copy of the court order and application not less than ten days prior to trial. The use of the words 'each party' and the use of 'communication' in the singular strongly suggests that the intercepted communication may be received as evidence against all parties to one conversation if the requirements of the section are met. Further, 18 U.S.C. § 2518(4) (a) requires that an order of authorization to intercept specify 'the identity of the person, *if known,* whose communications are to be intercepted.' Thus, a lawful order could be issued for intercepting the communications of unknown parties.

"Obviously, officers wishing to wiretap a telephone believed to be used by certain identified suspects cannot know the identity of all persons who may telephone or be telephoned, by those suspects and thus cannot specify the identity of such unknown parties in their application. To impose such a requirement would be to require the impossible." 323 F.Supp. 296, 325.

This Court finds such reasoning persuasive, and particularly applicable to the present case. It is obvious that the alleged smuggling activities which are the subject of this action constituted a large-scale operation having many members in many different locations. Accordingly, the wiretap was instituted for a dual purpose: to uncover the whereabouts of the contraband *and* to ascertain the identity of King's confederates. If evidence elicited from the wiretap could be used only against those whose names are already known to the authorities, the latter purpose, one clearly intended by Congress in passing Title III, would be permanently frustrated. This Court does not support such a debilitating interpretation.

As has been discussed previously, the safeguards required by *Katz* and *Berger,* *supra,* were built into the statute to pass constitutional muster. It is reasonable to assume that when electronic surveillance is effected, both ends of the conversation will be intercepted. Since only those conversations which bear directly on the offenses charged may be admitted into evidence, I do not think it unreasonable that they be used against the speaking parties, even if their identities were initially unknown. As Judge Cabot

points out, the statutory language permits this; the order merely authorized it. It is the feeling of this Court that the particularity otherwise required by the statute was incorporated into the authorizing order and prevents it from being overbroad and general in nature.

Motions to suppress evidence on this basis are denied.

### 4. Judicial Order as Warrant

A final point, raised by counsel for defendant King, is that electronic surveillance may not be effected by judicial *order,* rather than *warrant,* as required by the language of the Fourth Amendment. This Court fails to see the relevance of such a distinction. Certainly, since the requirements of "oath or affirmation" and probable cause are the same, no rights of defendant can be claimed to have been violated. In fact they may even be considered better protected, as a wiretap may be authorized only by a judge, rather than by a magistrate as in the case of the ordinary search warrant.

Motions based on such meaningless semantic distinctions are denied.

This Court holds that the authorizing order signed by Judge Schwartz on March 20, 1971, complied sufficiently with the requirements of Title III, and all motions based on its insufficiency are denied.

### D. *Execution of the Order by Customs Agents—The "Minimization Issue"*

Having considered the constitutionality of the statute as well as the sufficiency of the application and authorizing order, this Court now directs its attention to the actual execution of the intercept order, by far the most important issue of the pretrial proceedings. Arising here is the question of whether the wiretap was in fact conducted "in such a way as to minimize the interception of communications not otherwise subject to interception" as required by Section 2518 (5) and the judicial order issued in pursuance thereto. Defendants King, Vesco, Thieda, and Swisher have made a motion, joined in by others of the defendants in this case, to suppress all evidence derived from the wiretap on account of the Government's failure to exercise any kind of minimization.

### 1. Factual Findings as to Minimization

The order authorizing the wiretap on King's telephone was signed by Judge Schwartz on March 20, 1971. It was instituted immediately and was carried on for an initial period of twenty days. On April 9, the authorization was extended for fifteen days, and similar extensions of seven days each were granted on April 23 and April 30. The wiretap was terminated on the evening of May 3, 1971, after the arrests of most of the alleged conspirators and the seizure of the five tons of marijuana had been effected.

Evidence elicited from evidentiary hearings before this Court on August 3, 1971 and from September 28, 1971 to October 1, 1971, reveals that electronic surveillance was maintained from an apartment leased for the purpose about two blocks from King's residence at 2002 First Avenue in San Diego, California. It was conducted by Customs Service Special Agents Lackey and Kern under the direct personal supervision of Senior Resident Agent Martin.

The wiretap on King's telephone was in effect for a total of forty-five days, twenty-four hours a day. It was the testimony of Agent Martin that during that time every communication that came across the tapped wire was recorded, regardless of who the parties were or the nature of the conversation, while an estimated ninety percent of the phone calls were monitored by the surveilling agents. (Transcript, page 229).

Martin also testified that he had received certain instructions as to the conduct of the wiretap from Charles Fanning and Elizabeth Meyer, attorneys from the Narcotic and Dangerous Drug Section, Southwestern Unit, of the Criminal Division of the Justice Department. These instructions were that every conversation was to be recorded, except

those between an attorney and client concerning a pending criminal case. As to those conversations which were obviously irrelevant to the smuggling conspiracy, the agents were simply told there was no need to monitor them. (Transcript, page 228.)

This Court also received testimony from Mr. Fanning, who, as Chief of the Southwestern Unit, was the attorney assigned to oversee the prosecution of this case. He confirmed Agent Martin's testimony as to the instructions given to the agents as to the conduct of the wiretap. (Transcript, pages 495–498.) He also testified that he gave what he believed to be the correct instructions. (Transcript, page 510.) *

As has been noted above (see Part C of this opinion), the authorizing order, pursuant to Section 2518(5) of the statute, provided that the wiretap be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. And, as also noted, communications lawfully subject to interception in this case were specifically confined to those which concerned (1) the date, time and place of the loading of marijuana aboard the *Mercy Wiggins*, (2) the date, time and place of the loaded vessel's arrival in the United States, and (3) the identities of members of the conspiracy. It is apparent that compliance with the provisions of the authorizing order requires those responsible for the execution of the wiretap to devise some means of limiting interception—interpreted by this Court to mean either monitoring *or* recording of telephonic communications—to conversations falling within these categories. From the record in this case, the Government's adherence to the requirement of minimization is seriously in question.

The very able Assistant United States Attorney has argued persuasively that sufficient minimization was exercised in this case to meet the requirements both

of the statute and of the order. First, he maintains, it is impossible to determine whether a conversation is relevant unless it is monitored. Second, a detailed analysis of the transcript of the wiretap shows that some 85% of the phone conversations may now be considered relevant and of evidentiary value, indicating that the Government was within its rights under the order in intercepting them. This Court cannot completely accept either argument.

The practical difficulties besetting attempts to determine relevancy are acknowledged. Obviously, a conversation which appears innocent at the outset may at some later time shift to the very offenses under investigation and disclose information of great value to the prosecution of the case. Nowhere is this better illustrated than in a conversation between defendant King and an unidentified female named Phyllis which ran from page 1328 to page 1372 in the transcript. The conversation was totally irrelevant except for some two pages right in the middle, in which the conversation turned briefly but pointedly to the conspiracy.

█ Nevertheless this Court is reluctant to find that this conversation should have been intercepted. The object of minimization is to prevent the wiretap from turning into the kind of general search and wholesale invasion of privacy decried by the Supreme Court in Berger v. New York, *supra*, and Katz v. United States, *supra*. By justifying blanket surveillance on the ground that something relevant might turn up at any moment, the requirement of minimization would be rendered nugatory and the right of privacy non-existent.

It is stated at page 18 of the Manual for Conduct of Electronic Surveillance Under Title III, a publication prepared by the Justice Department for the use of its attorneys, that "interception under Title III is to be considered an investi-

---

* Based upon the manual furnished him by the Department of Justice this may have been a proper interpretation. However, the Court finds the manual to be incorrect in this regard.

gative tool of last resort." Since this is so, it would appear unnecessary that the Government execute the wiretap with the idea of gleaning every conceivable shred of relevant conversation from every phone call. Rather, it could satisfy itself with information received from conversations falling more easily within the classes which the statute requires to be particularly described. This means that if after a certain amount of time has elapsed a conversation still appears innocent, the Government would cease interception out of respect for the parties' constitutional rights and for the limited system which Congress so painstakingly created. An exception to this might be phone calls between known conspirators which may be intercepted in their entirety due to the strong possibility that the conversation may take a relevant turn.

The Government's second contention, that during the entire course of the wiretap only a possible fourteen percent of the phone calls should not have been monitored, likewise cannot be fully accepted by this Court. For one thing, this figure represents percentages of phone calls made or received over the tapped wire and bears no relation to what proportion of the forty-eight hours of recorded conversation, amounting to 1556 pages of transcript, were devoid of investigative value. For example, a phone call between a female named Barbara and her mother, which made no reference whatsoever to the conspiracy, was only one of nearly nine hundred recorded phone calls, or .11% of the total, assuming the accuracy of the Government's figures. Yet it takes up fourteen pages, or .9%, of the entire transcript. The fourteen percent figure, then, is misleading and of questionable significance to this case.

The analysis which now renders 85% of the intercepted phone calls of positive evidentiary value is also suspect for a second, more important reason. Accepting the analysis on its own terms, the classifications seem logical. According to the Government, there were instances in which a new party was involved in a phone conversation, and his identity and relationship to the conspiracy had to be determined (7%); calls between known conspirators (21.4%); attempted conversations between conspirators (12%); conversations between a known conspirator and an innocent third party relating to the conspiracy (3.7%); calls so short that they terminated before relevancy could be determined (22.3%); calls to non-participant parties who had knowledge of the offense or who provided information of investigative value (4.5%); calls involving other offenses against the law (4.2%); calls relating to the message-recording device on King's telephone (14.4%); and finally, the calls conceded by the Government to be innocent (14%).

However, this analysis was not prepared concurrently with the execution of the wiretap, but rather some five months later, well after minimization had become an issue in this case. At the time of the wiretap, a far lower proportion of the intercepted communications were deemed relevant, as indicated by the progress reports which were submitted to Judge Schwartz at frequent intervals in accordance with the authorizing order. During the first five days approximately 120 calls to or from the subject telephone were intercepted, of which 90 (75%) were not considered relevant. During the second five days 96 calls were intercepted, of which 72 (75%) were considered irrelevant; during the third five days 19 of 22 intercepted calls (86%) were considered irrelevant.

The figures in the progress reports continue in the same manner. Between April 9 and April 14, 1971, at which time the surveilling agents had been tapping the phone for approximately twenty-six days, 200 out of 220 phone calls (91%) were not considered relevant. Between April 14 and April 19, 1971, 180 out of 221 phone calls were not considered relevant. And, finally, between April 23 and April 26, 1971, 38 days into the interception, 75 out of 80 calls (94%) were not considered relevant. It appears

that there is a vast disparity between these figures and the 85% figure now urged upon us by the Government.

Considering the statute in the light not only of its own language but also of the background against which it was passed, this Court finds that minimization must be effected during the operation of the wiretap. The requirements of the Fourth Amendment cannot be met by interceptions executed in a blanket fashion with the hope that the passage of time may invest them with a relevance not immediately apparent.

It appears to me that despite the practical difficulties, Congress intended "minimization" under Section 2518(5) to involve something more than the mere provision for the limited attorney-client privilege. Therefore, it is the finding of this Court that the Government's attempts to comply with the minimization provision of the authorizing judicial order were unsatisfactory.

2. Conclusions of Law as to Minimization

Having found that the Government failed to fulfill satisfactorily the minimization provision of Judge Schwartz' order, this Court must now rule on defendants' motions to suppress the wiretap. This question is certainly the most difficult arising out of this complicated case, and probably the most difficult this Court has ever been asked to decide.

What I now consider are motions to suppress all the evidence which the wiretap provided on the basis that a good portion of the communications coming over defendant King's telephone were intercepted illegally. Such a motion is grounded in the so-called "exclusionary rule" by which the Supreme Court, beginning with Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), has sought to control the activities of law enforcement officials by excluding from a criminal prosecution evidence obtained in violation of the accused's Fourth Amendment rights. Since the wiretap in the present case was executed in a manner not in complete accord with defendants' right to be secure against unreasonable searches and seizures, it is urged that none of the intercepted communications be held admissible against the defendants. To borrow a phrase from Justice Cardozo, "The criminal is to go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926).

In support of their position, defendants cite to us the recent District of Columbia case of United States v. Scott, 331 F.Supp. 233 (D.D.C.1971), involving a situation closely akin to the one presently before this Court. There, in spite of the authorizing judge's unequivocal mandate to restrict interception to communications specifically relating to narcotics, virtually all conversations were monitored and recorded although some 60% were completely innocent.

Judge Waddy concluded that this constituted the kind of indiscriminate use of wire surveillance proscribed by *Katz* and *Berger*, and suppressed the entire contents of the wiretap. His reasoning was as follows:

"If this Court were to allow the Government agents to indiscriminately intercept every conversation made and to continue monitoring such calls when it becomes clear that they are not related to the 'authorized objectives' of the wiretap and in violation of the limiting provisions of the order such order would become meaningless verbiage and the protections to the right of privacy outlined in *Berger* and *Katz* would be illusory." 331 F.Supp. page 248.

While this Court agrees with *Scott* that indiscriminate interception by Government agents is an invasion of privacy not to be tolerated, it is not clear that the application of the exclusionary rule to the wire surveillance requires complete suppression. While it is true in this case that a substantial portion of the 1556-page wiretap transcript represents unauthorized interceptions, it must be emphasized that the rest was monitored and recorded by Customs agents in com-

pliance both with the statute and the authorizing order.

There is as yet very little law to which a court may look for guidance in interpreting the provisions of Title III. It is possible that the great delicacy which inheres in a wiretap situation sets it so far apart from other types of searches and seizures that error as to the conduct of a part of the surveillance renders the entire interception invalid. Judge Waddy thought so, and he suppressed all the evidence. This Court takes issue with this position as having no legal basis, preferring to consider wiretaps within the framework of the general law of search and seizure and to follow its principles. See Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) and 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. Cox, 449 F.2d 679 (10th Cir. 1971).

Throughout its history, whenever application of the exclusionary rule has resulted in total suppression of evidence in a criminal prosecution, it has been because the entire search and seizure was considered tainted by some violation of Fourth Amendment rights. See, e. g., Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). This was the case even in Berger v. New York, *supra*, and Katz v. United States, *supra*, the two decisions having the most significance in the genesis of constitutionally-approved electronic surveillance. In *Berger* the New York statute which authorized the electronic eavesdrop was adjudged unconstitutional so that no search pursuant to that statute could be valid either in whole or in part. Likewise in *Katz* an otherwise validly executed "bug" was considered a violation of the Fourth Amendment because not authorized by a judge. The entire search was void *ab initio*.

The case presently before this Court is of a different nature. Here we have a constitutional statute and a valid warrant (authorizing order) issued thereunder. In its execution, however, some, but not all, of the evidence seized lay beyond the scope of the warrant.

There are few cases involving analogous facts, and other than *Scott, supra*, none involves a wiretap. In Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) a prohibition agent had obtained from a United States Commissioner a warrant for the search of petitioner's residence. In it the things to be seized were particularly described —intoxicating liquors and articles for their manufacture. However, in carrying out the search the agents also seized a ledger and certain bills from the premises of the apartment. The Supreme Court, while upholding the admissibility of these latter items on other grounds, found that such seizure was not authorized by the warrant and would not be admitted on this basis. What is significant in *Marron* is that there was no question of suppressing the liquors which had been validly seized under the warrant.

Other cases on this point are of less compelling precedential value. See Brooks v. United States, 416 F.2d 1044 (5th Cir. 1969), reh. denied 424 F.2d 554 (1970); United States ex rel. Nickens v. La Vallee, 391 F.2d 123 (2d Cir. 1968); United States v. Castle, 213 F.Supp. 56 (D.D.C.1962). Nevertheless the reasoning employed, based on the language of Rule 41(e) of the Federal Rules of Criminal Procedure, is persuasive. That Rule provides that if "*the property* seized is not that described in the warrant," then "*the property* shall be restored unless otherwise subject to lawful detention and *it* shall not be admissible in evidence at any hearing or trial." (Emphasis added.) This language would seem to require an item-by-item consideration of the warrant and

the items seized during the search pursuant thereto. With the exception of *Scott*, defense counsel has cited us to no contrary opinion, nor could our own research discover any. Combined with the above-quoted language of Rule 41(e), this indicates to the Court that in the ordinary case, the seizure of some items of evidence in excess of those specified in a search warrant does not result in the suppression of those items which were validly seized.

It is our belief that with no higher court authority to the contrary, this principle applies as well to wiretaps under Title III, 18 U.S.C. § 2510 et seq. Section 2518(10) (a), the section that addresses itself to motions to suppress interception, like Rule 41(e), may be considered as support for this position. The language here provides that any aggrieved person "may move to suppress the contents of any intercepted wire or oral *communication,* or evidence derived therefrom, on the grounds that—

(i) the *communication was* unlawfully intercepted;

(ii) the order of authorization or approval under which *it was* intercepted is insufficient on *its* face; or

(iii) the *interception was* not made in conformity with the order of authorization or approval." (Emphasis added)

This language, using the singular form throughout, appears to indicate that a motion to suppress may be directed toward one or more allegedly unlawful interceptions, and that if such motion were granted, suppression of the entire wiretap would not be a necessary consequence.

It is the decision of this Court, therefore, that defendants' motions to suppress the entire contents of the wiretap on the basis of the Government's failure to minimize interceptions are denied.

I wish to make clear, however, that this ruling is directed only to those motions which are presently before this Court. Thus I intend to consider anew any defendant's objection to the introduction of a particular item into evidence at trial on the ground that the interception by which it was obtained was beyond the scope of the authorizing order.

That this Court has declined to suppress the entire wire interception should in no way be taken as judicial approval of the Government's tactics. By failing to minimize surveillance in accordance with the statute and the authorizing order, the Government has placed upon this Court the burden of effecting minimization, a situation hardly envisioned by the statute, and one which this Court does not willingly accept. The Government would do well to remember that the limited system which the statute creates is designed to prevent unreasonable invasions of privacy, not to repair them, and that if those limitations are not voluntarily adhered to by the Government, total suppression may well prove to be the only feasible solution.

Motions to suppress the entire contents of the wire surveillance are denied.

### E. *Interference with Attorney-Client Relationship*

Defendant Vesco has moved to suppress the wiretap evidence on the ground that the surveillance involved an intrusion into the lawyer-client relationship protected by the Sixth Amendment. This Court finds no merit to such a contention.

It is clear that the attorney-client privilege encompasses more than merely those conversations which involve a "pending criminal case." It protects confidential communications between attorney and client made because of their professional relationship, and it is designed to insure confidence and complete disclosure between them. United States v. Goldfarb, 328 F.2d 280 (6th Cir. 1964), cert. denied 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); Baird v. Koerner, 279 F.2d 623 (9th Cir. 1960).

However, in this case defendant Vesco, who is an attorney, was him-

self indicted as a member of the alleged smuggling conspiracy now before this Court. In such a situation the privilege does not apply for several reasons. First, the attorney-client privilege is for the protection of the client and not the attorney. Baldwin v. Commissioner of Internal Revenue, 125 F.2d 812 (9th Cir. 1942); United States v. Kahn, 251 F.Supp. 702 (S.D.N.Y.1966). Second, communications between attorney and client which concern illegal activities in progress or yet to be performed are not offered the shield of privilege. Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); United States v. Hoffa, 349 F.2d 20 (6th Cir. 1965), aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Sawyer v. Barczak, 229 F.2d 805 (7th Cir. 1956), cert. denied 351 U.S. 966, 76 S.Ct. 1025, 100 L.Ed. 1486 (1956); United States v. Weinberg, 226 F.2d 161 (3rd Cir. 1955), cert. denied 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815 (1956). Third, when the attorney himself is allegedly involved in the illegal activities, the relationship is not even one of attorney and client. The claim to privilege is thus even further attenuated. Hett v. United States, 353 F.2d 761 (9th Cir. 1966), cert. denied 384 U.S. 905, 86 S.Ct. 1339, 16 L.Ed.2d 358 (1966). See also Morgan v. United States, 380 F.2d 686 (9th Cir. 1967); Olender v. United States, 210 F.2d 795 (9th Cir. 1954).

This Court sees no reason to suppress the wiretap on this basis, and defendant Vesco's motion is therefore denied. I do wish to reiterate, however, that if at trial the Government seeks to introduce evidence which may be considered a real intrusion into a bona fide lawyer-client relationship, this Court will sustain an objection on that ground.

### F. *Effect of Deputy Bellon's Participation*

Defendants Vesco, Thieda, and Swisher have moved to suppress the contents of the intercepted communications on the basis of San Diego County Deputy Sheriff Dennis Bellon's participation in the wiretap.

As grounds for this motion defendants rely upon Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In that case the Supreme Court abolished the "silver platter doctrine," which previously had allowed federal prosecutors to use evidence which would have been inadmissible in state criminal proceedings because obtained by state officers during a search and seizure conducted in violation of their own state laws. Therefore, reasons the defense, since California Penal Code Section 630 et seq. prohibits any kind of wire surveillance, Deputy Bellon, by participating in the tap on defendant King's telephone, has broken the law, and consequently the United States cannot now avail itself of the intercepted communications.

This Court does not accept this premise. *Elkins* involved a situation in which evidence obtained by state officers by means of an unlawful search and seizure was sought to be introduced against the defendant in the trial in federal court of a federal crime. Not only was the seizure excludable under applicable state law, but under federal law as well. The idea in *Elkins* was that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over defendant's objection in a federal criminal trial. Thus the United States Attorney was deprived of the rather anomalous right to avail himself of evidence seized by state officers which could not be admitted in state proceedings and, had it been seized by federal officers, could not be used in federal proceedings.

It is obvious that the instant case does not present an analogous situation, since this Court has already decided that a wiretap is a valid search under the Fourth Amendment. (See Part A above.) As the Supreme Court itself stated in *Elkins*, "The test is one of fed-

eral law, neither enlarged by what one state may have countenanced, nor diminished by what another may have colorably suppressed." 364 U.S. 206, 224, 80 S.Ct. 1437, 1447.

 It appears to this Court that the more pertinent question raised here, irrespective of *Elkins,* might have been whether, as a matter of respect for state law and policy, a federal court would refuse to accept into evidence the products of a seizure which, if conducted exclusively by federal officers, would have been perfectly proper, but was in fact assisted in by state officers who were thus violating their own state statute. However, considering the factual context of the instant case, it is unnecessary for this Court to decide this question. From testimony taken at the evidentiary hearings on these motions, it appears that Deputy Bellon was present at the surveillance site on one occasion during the course of the wiretap. (Transcript, pages 227, 465.) It was never revealed whether his presence on that occasion was necessary or even helpful to the progress of the tap. Thus, Bellon's "participation," if it can be termed such, is minimal at most, and did not in any way affect the operation of the wiretap by the federal officers responsible for its execution.

It is therefore the decision of this Court that Deputy Bellon's participation in a search carried on under federal warrant by federal officers was *de minimis,* and motions to suppress on this basis are denied.

 California's wiretap prohibition is also the basis for the second argument raised by counsel for defendant Swisher somewhat along the same lines. It is his contention that because California outlaws wire surveillance, a federal court sitting within the territorial bounds of this state should not admit wiretap information into evidence even if there had been no state participation in the wiretap. Such a contention apparently ignores the Supremacy Clause of the Constitution, which dictates that

whenever there is a conflict between state and federal law, federal law will govern. United States Constitution, Art. VI, Cl. 2.

As authority for the contrary position he takes, counsel cites Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) as stating that in cases under the Fourth Amendment the Supreme Court "has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution." 374 U.S. 23, 37, 83 S.Ct. 1623, 1632. This Court has analyzed at length not only *Ker* but also United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); and Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), which are the cases used by the Supreme Court in support of the above-quoted principle. I believe that in order to understand this "rule" it is necessary to look at *Ker* in its proper context.

In United States v. Di Re, *supra,* relied upon in *Ker, Miller,* and *Johnson, supra,* the relevant language is quite refined. In that 1948 case the Supreme Court held that "in the absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." 332 U.S. 581, 589, 68 S.Ct. 222, 226. Thus the principle enunciated in that case appears to be confined to a situation concerning (1) arrest without warrant, and (2) with no federal statute on the subject.

Less than one month later the Supreme Court decided Johnson v. United States, *supra,* a case likewise involving arrest without warrant. In that case the Court again referred to state law in passing on the validity of the arrest, stating in a footnote that "State law determines the validity of the arrests without warrant," and citing *Di Re, supra,* as authority, 333 U.S. 10, 15, 68 S.Ct. 367, 370. If there was no applicable federal statute in January, 1948, when *Di Re* was de-

cided, it is unlikely there was one in February, 1948, when *Johnson* came down. Thus, the factors distinguishing *Di Re* from the matter now before this Court are present in *Johnson* as well. The instant matter does not concern a warrantless arrest, and there *is* a federal statute present.

Again, in Miller v. United States, *supra,* a warrantless arrest was involved, but this time it was made by municipal officers of the District of Columbia for a violation of federal law. There the language of the court was explicit: where an arrest for violations of federal law was made by state, or in this case District of Columbia peace officers, "the lawfulness of the arrest without warrant is to be determined by reference to state law." 357 U.S. 301, 305, 78 S.Ct. 1190, 1194. This quoted language, taken alone, might seem to represent a sweeping principle of law, but is obvious that it takes on a totally different meaning when read in context. It follows that Ker v. California, *supra,* which involves a warrantless arrest by state officers for a state offense, must be read in the same manner.

This Court finds that the language of *Ker* and the cases it relies upon, when considered in their factual contexts, do not support the sweeping principle put forth by defense counsel. For this reason this Court declines to ignore the plain words of the Constitution and denies defendant Swisher's motion to suppress on the basis of California law.

II

MOTIONS TO SUPPRESS BACK-
GROUND CONVERSATIONS

It appears from the facts of this case, supported by the testimony of Mr. Fanning (Transcript, page 495), that the surveillance equipment used in the Government's wiretap of King's telephone could pick up not only communications coming over the telephone line but also any conversation taking place in the room within hearing distance of the telephone when the receiver was off the

hook. These background conversations were at times extremely relevant to the alleged conspiracy and were dutifully intercepted and recorded by the monitoring agents with the approval of Mr. Fanning.

Background conversation, however, was not specifically described in the court order authorizing the wiretap. The Fourth Amendment requires that search warrants particularly describe the things to be seized, and the law is clear that a seizure of one thing under a warrant describing another is prohibited. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

■ Since only "wire communications" were described in Judge Schwartz' order, the Government's interception of any other type of communication constituted an unreasonable search and seizure in violation of the Fourth Amendment.

Defendants' motions to suppress evidence acquired from the electronic surveillance of background conversations are hereby granted.

III

MOTIONS TO SUPPRESS EVIDENCE
FROM USE OF PEN REGISTER

On March 20, 1971, Judge Schwartz authorized the use of a pen register in conjunction with the Title III electronic surveillance so that the destination of outgoing telephone calls could be determined. This order was thrice extended. Defendants seek to suppress the contents of electronic surveillance by mounting a dual offensive against the use of pen register devices: (1) use is unlawful under 47 U.S.C. § 605, and (2) use is violative of the Fourth Amendment as a general and exploratory search.

This Court is uncertain of the effect upon admissibility of communications seized pursuant to proper judicial authorization were defendants correct in their assertions. The pen register did not aid in the actual interception of verbal communications; it merely allowed

investigating officers to associate conversation with a discoverable point of destination, and thus a discoverable individual. The most defendants could obtain, therefore, would be suppression of the limited information gained from the pen register. Suppression of this matter would have little effect upon the seized conversations. Nor would it ultimately affect the identity of call recipients; the numbers could be ascertained through mechanical slowdown of the tapes made under Title III since the tapes include the dialing sounds.

 Pen register use is not governed by Title III, as it is not an interception of communications as defined by Section 2510(4), United States v. Escandar, 319 F.Supp. 295 (D.C.Fla.1970), and thus compliance with the strict requirements of that title is not required. The Court does not accept defendants' contention that the use of a pen register is absolutely prohibited by Section 605. In United States v. Dote, 371 F.2d 176 (7th Cir. 1966), and United States v. Guglielmo, 245 F.Supp. 534 (N.D.Ill.1965), the court held pen register use prohibited under the second clause of Section 605 finding that its use constituted an unauthorized "interception" for purposes of that section. To disclose the existence of such communication is absolutely prohibited. In United States v. Caplan, 255 F.Supp. 805 (E.D.Mich.1966), the court considered the propriety of pen register use under the first clause of Section 605, finding that an Internal Revenue Service summons was not, in that particular case, sufficient "other lawful authority" to justify disclosure of the existence of communications. Alternatively, its use was found to be an unlawful "interception" under the second clause. Since the date of those holdings, Section 605 has been amended so that "any communication" (which would include wire and radio communications) now reads "any radio communication." This would serve to remove pen register coverage from the second clause and include it, if at all, within the first clause. This Court believes that divulgence "on demand of other lawful authority" must include disclosure pursuant to a search warrant issued under Rule 41 of the Federal Rules of Criminal Procedure.

 Defendants' second argument is reiterative of that raised against the constitutionality of a wiretap intercepting the conversations of all people using the tapped line in Part I(C) (3) above. It is similarly rejected here. Conversations searched and seized from defendants not individually specified in the surveillance authorization order are held to be admissible against them under Title III. It follows from this that the seizure of the identity of these unspecified individuals is likewise proper under the Fourth Amendment. Seizing one's identity can be no greater an intrusion on individual privacy than seizing one's conversation.

This Court, therefore, holds that the judicial authorization for installation of this pen register issued upon a requisite showing of probable cause and that the demands of the Fourth Amendment, Berger v. New York, *supra*, Katz v. United States, *supra*, and Rule 41 are satisfied. Motions to suppress evidence on this basis are denied.

### IV

### MOTION TO DISCLOSE ENTIRE CONTENTS OF WIRE SURVEILLANCE

As indicated previously, the entire activity of telephone number (714) 233-8650 during the period from March 20, 1971, to May 3, 1971, was intercepted by the Government. Due to this failure to minimize surveillance as required by the authorizing order (see Part I(D) above), the transcription of the tapes came to a voluminous 1556 pages, some of which was matter highly personal and irrelevant to the instant proceedings. In an effort to protect the privacy of the individuals whose conversations had been seized, this Court went over the entire transcript *in camera*, deleting those conversations having no evidentiary value and whose disclosure could serve no use-

ful purpose. This edited version was then released to defendants without opposition from the prosecution.

Prior to pretrial motions hearings, however, all defendants joined in a motion praying that the entire transcript, as well as an opportunity to review the original tapes, be made available to them. This motion is based on Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), in which the Supreme Court held that a criminal defendant must be given the opportunity to inspect all surveillance records in order to determine whether evidence against him grew out of his illegally-overheard conversations.

In light of *Alderman,* and since this Court has indicated its intention to consider anew any objection to the admission of evidence bearing the taint of illegal surveillance, it is my decision to make the entire transcript available to all defense counsel on a strictly controlled basis. This Court wishes to emphasize that this disclosure is made only with the strong admonition, issued orally from the Bench and reiterated herein, that defense counsel, or indeed any person having access to the transcript, are not to discuss its contents with anyone except as necessary in the preparation of this case for trial. Anyone who violates this order will be held in contempt of court with serious consequences to follow.

Defendants' motion for complete disclosure of the wire surveillance is hereby granted.

## V

### MOTIONS AS TO THE LEGALITY OF THE SEIZURE OF THE MERCY WIGGINS

Defendant Olson has moved to suppress the evidence found aboard the vessel *Mercy Wiggins,* to dismiss the indictment, and to have his property returned. He bases his motions on the allegation that at the time of seizure the *Mercy Wiggins* lay outside the twelve-mile line which marks the limit of the territorial jurisdiction of the United States. This, he asserts, would render the warrantless boarding of the vessel by Customs agents an illegal act requiring the suppression of the evidence seized and the return of the vessel.

The Government opposes the motion on three separate grounds: first, that the boarding and seizures in fact occurred within United States territorial jurisdiction; second, that the *Mercy Wiggins* was a "hovering vessel" as defined by 19 U.S.C. § 1709, and, as such, whether within or without "customs waters" could be lawfully boarded and seized by Customs officers who had probable cause to believe that the vessel had been used or was being used to violate the federal criminal laws; and third, any United States vessel whether on the high seas or elsewhere may be boarded, searched and seized by Customs and Coast Guard officers who have probable cause to believe that such vessel has violated or is violating federal criminal statutes.

The question presented by this motion appears to be in the first instance an evidentiary one: that is, the exact location of the *Mercy Wiggins* at the time of seizure. Counsel for defendant Olson maintains that the seizure occurred at the approximate coordinates of 37° 47′ N. Lat. 122° 51′ W. Long., a point thirteen to fifteen miles out to sea and therefore outside the jurisdiction of American Customs officials. The Government claims that the vessel was boarded at the coordinates of 37° 48′ N. Lat. and 122° 48′ W. Long., a location less than ten miles west of the mainland in the San Francisco area.

Testimony was taken at the pretrial motions hearing from Michael Auvinen, a Boatswain's Mate aboard the Coast Guard Cutter *Point Barrow,* the vessel from which the Customs agents boarded the *Mercy Wiggins* and effected the seizure of the boat and its contents. The evidence presented (Transcript, page 50) has convinced this Court that the *Mercy Wiggins* was seized at the location claimed by the Government, and I find as a

matter of fact that this point, located be-tween the Farallon Islands and the mainland, lies well within any alleged twelve-mile limit.

This Court is not convinced that the twelve-mile jurisdictional boundary actually applies as a matter of law in a situation involving an American vessel suspected of carrying contraband. However, having found that the seizure of the *Mercy Wiggins* did occur within twelve miles of shore, it is not necessary to decide that question. Thus the Government's second two arguments will not be considered.

 Defendant Olson raises one other point with regard to the seizure, and that refers to the failure of the Customs Service to allow petitioner an opportunity to make a customs declaration prior to the seizure. Since smuggling only occurs at a port of entry, he reasons, there could have been no smuggling, and therefore the seizure was illegal.

A complete answer to this is that the indictment does not charge Olson and his confederates with "smuggling," which does occur only after customs inspection has been passed, but with "conspiracy to smuggle," along with the communications counts. On this basis such motion is without merit. See Palmero v. United States, 112 F.2d 922 (1st Cir. 1940).

 It is the holding of this Court that agents of the United States Customs Service had an absolute right to board and search the *Mercy Wiggins* and to seize not only the contraband, but the vessel itself. Motions to dismiss the indictment, suppress evidence, and return property based on the alleged illegality of the seizure are therefore denied.

## VI

## MOTIONS TO DISMISS THE INDICTMENT

Several defendants have moved to dismiss the indictments on various bases. These motions will now be considered by this Court.

A. *Validity of Indictment Under 18 U.S.C. § 1403(a)*

Defendant Olson moves the Court to dismiss Counts 6, 7 and 8 of Indictment number 11627; defendant King joins the motion as to Counts 2, 3, 4 and 5; defendant Vukich joins as to Counts 19 and 20. Each specified count is predicated upon a violation of 18 U.S.C. § 1403(a), which prohibits the use of any communication facility in committing, facilitating, attempting or conspiring to commit an offense for which a penalty is imposed by the narcotics control acts. The attack upon 1403(a) is three pronged: (1) the section is violative of the First Amendment; (2) it is unconstitutionally vague and uncertain; and (3) it has been repealed by Section 1101(b) of Public Law No. 91–513. None of the attacks has validity.

 It cannot be disputed that 1403 (a) can have an inhibiting effect on ordinary speech. This is not to say, however, that such inhibition would be constitutionally prohibited. The only speech restricted is that which relates directly to inciting or producing imminent conduct prohibited by federal law. Consequently, if a prohibition upon the use of a communication device may be viewed as indirectly chilling speech, that chilling is permissible because the "clear and present danger" test stated in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) is met.

 Secondly, defendants submit that one is not sufficiently apprised of the elements of a 1403(a) offense and thus the provision is unconstitutionally vague and uncertain. This Court agrees with the language of Judge Palmieri in United States v. Butler, 204 F.Supp. 339 (S.D. N.Y.1962), in which he states that 1403 might be challenged for vagueness if it were construed as not incorporating the definition of the offense for which the communication facility was utilized. In this instance, all definitional elements of 21 U.S.C. § 176a are included by reference in a 1403(a) offense. Therefore, Section 1403(a) gives "adequate warn-

ing as to what conduct falls under its ban," United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947); United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952), and is not void for vagueness.

■ An oblique attack is mounted upon 1403(a) by suggesting that the holding in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), eliminates the revenue power base of the section and renders 1403 unconstitutional. This overlooks two important considerations: firstly, 1403(a) was the product of both the revenue and commerce powers, United States v. Contrades, 196 F.Supp. 803 (D.Hawaii 1961), and even if the revenue foundation crumbled under *Leary*, commerce support would remain sound; secondly, *Leary* did not hold the sections there involved unconstitutional but rather recognized an absolute defense which might be raised to render prosecution unsuccessful. United States v. Covington, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969); Leary v. United States, *supra*, 395 U.S. at 27, 89 S.Ct. 1532.

Section 1403 was repealed by Public Law 91–513, Title III, § 1101(b) (1) (A) as of May 1, 1971. Provisions of the same act, however, expressly provide that repeals under 1101 shall not affect prosecutions for those acts which occurred before the effective date of repeal. Additionally, one may rely upon 1 U.S.C. § 109 to serve as a generalized savings provision.

Defendants submit that Section 1403 was the result of Congressional compromise arising from a 1956 refusal to include wiretap provisions in the 1956 narcotics control act. It was intended, they surmise, to cease being effective as soon as a wiretap law was given effect. If in fact this were the Congressional intent in 1956, it was considerably modified by 1970, for 21 U.S.C. § 843 (b) was then added to carry forward the prohibitions of 1403(a) but in a broader form so as to include all controlled

substances rather than only marijuana and narcotics.

Therefore, the above specified motions are denied as being without legal foundation.

B. *Failure to Transcribe Grand Jury Proceedings*

An Omnibus Hearing under Indictment No. 11257 was held before Magistrate Harry McCue on June 10, 1971. Counsel for Thieda orally moved the Court to order all additional grand jury proceedings transcribed. Other defendants were allowed to join in this motion and several bases of need were specified. After taking these oral motions under submission and reviewing the points and authorities offered, Magistrate McCue denied the motion, finding that only a "general need" had been raised, not the requisite "particularized need." He did, however, suggest to the Government that it would be prudent to do so in light of United States v. Thoresen, 428 F.2d 654 (9th Cir. 1970). A mere two days after the Magistrate's written order on July 9, 1971, the Government went before the Grand Jury to obtain the superseding Indictment No. 11627 without bothering to record the proceedings.

Defendants Thieda and Vesco now move this Court to dismiss Indictment 11627 because the Government failed to record the proceedings of July 9, 1971. They do not seek to have Magistrate McCue's decision reviewed but rather to attack a failure to record after an advance request, the advice of the Magistrate, and a preliminary showing of potential particularized need. It is argued that the disclosure provisions of Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Osborne v. United States, 371 F.2d 913 (9th Cir. 1967); and U. S. Industries, Inc. v. United States District Court, 345 F.2d 18 (9th Cir. 1965), are completely subverted by a Government refusal to record upon advance request.

■ Although this Court recognizes that Rule 6(d) and (e) of the Federal Rules of Criminal Procedure makes re-

cording and transcription of grand jury proceedings permissive rather than mandatory, Loux v. United States, 389 F.2d 911 (9th Cir. 1968); United States v. Thoresen, *supra,* I am aware of the unsound basis of that rule and the steady undercurrent of dissatisfaction to be found in the opinions. I am also mindful that a revised rule requiring all grand jury proceedings to be transcribed or at least recorded is presently being considered by the Advisory Committee on Criminal Rules. For the Government to neglect to record grand jury proceedings after a specific request for transcription and sound judicial prodding in that direction places the prosecution in some jeopardy. Authority exists which would allow this Court to dismiss 11627 were prejudice shown, United States v. Gramolini, 301 F.Supp. 39 (D.R.I.1969), and I would not hesitate to do so in the proper case. I find, however, that the defendants are not prejudiced by this imprudent Government action because of the complete disclosure of communications seized pursuant to the authorized electronic surveillance.

## C. *Validity of Arrests*

Defendants Swisher and Vukich move to dismiss the indictment on the ground that the arrest of each was without probable cause and hence illegal. Preliminarily it must be noted that even if both had been illegally arrested, this Court may retain jurisdiction over movants and need not dismiss the indictment, provided they have been brought physically before the Court and probable cause is now evident. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); Bacon v. United States, 499 F.2d 933 (9th Cir. 1971); Charron v. United States, 412 F.2d 657 (9th Cir. 1969).

Swisher argues that she was indicted and arrested only because she invoked the privilege against self-incrimination when called to testify before the Grand Jury. The evidence obtained during the hearings on these motions and the transcript of seized communications indicates otherwise, and this Court finds that ample probable cause for her arrest exists now and existed at the time of her arrest. Therefore, Swisher's arrest was lawful; her motion to dismiss is denied.

Vukich was arrested in the vicinity of the St. Francis Yacht Club in San Francisco on May 3, 1971, in company with King, Thieda and Light in King's camper. The arrest was warrantless and he argues that it was also without probable cause. As is the case with Swisher, ample probable cause existed from the intercepted communications for his warrantless arrest. His motion to dismiss is likewise denied.

A primary purpose behind Vukich's motion is to have certain evidentiary items, seized from his person after the arrest, suppressed as being the product of an unlawful arrest. Inasmuch as the arrest was lawful, the search was incident to a lawful arrest and the items seized need not be suppressed. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Vukich further attacks the indictment by challenging the sufficiency of evidence before the Grand Jury. While a defendant has no right to a dismissal on the ground that evidence inadmissible at trial was presented to the Grand Jury, Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), a motion such as this is addressed to the sound discretion of the court. United States v. Tane, 329 F.2d 848 (2d Cir. 1964). This Court finds sufficient competent evidence was presented to the Grand Jury upon which an indictment against Vukich could be returned. I will not interfere with their determination.

## VII

### OTHER MOTIONS TO SUPPRESS EVIDENCE

This Court also has before it certain motions to suppress evidence in

this case other than that obtained through electronic surveillance. Virginia Pope moves to suppress for all purposes statements made by her in response to custodial interrogation. It is argued that the statements in question were elicited without her having been advised of her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The evidence indicates that the admonition was given only towards the end of the interview. Therefore, this Court orders these statements suppressed for use in the Government's case in chief.

She further argues that she clearly indicated a desire to terminate the interrogation and that the Government agents ignored the request. From this she concludes that her statements may not be utilized as impeachment evidence under Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), since it smacks of coercion and is thus likely to be unreliable and untrustworthy. See Alesi v. Craven, 440 F.2d 975 (9th Cir. 1971). The Government does not oppose the motion although it does not concede its validity. Rather it has advised the Court that it will not attempt to introduce the challenged evidence at trial. Consequently, this motion is granted in both particulars.

■ Defendant King seeks to suppress as evidence material seized after a search of his apartment. The search warrant was supported by an affidavit executed by Special Agent Richard R. Lackey. King attacks this affidavit in a manner identical to the challenge to the application for authorization to institute electronic surveillance, but the offensive here is no more successful than it was there. (See Part I(B) (1, 3 and 4), *supra.*) It is also incorrectly urged that the affidavit is defective for it contains information obtained via an illegal electronic surveillance of King's telephone. Since the surveillance was lawful, the information was properly considered to evaluate probable cause.

■ King further seeks to suppress evidence obtained in a search of an apartment occupied by his accountant. He argues that the facts giving rise to probable cause for that search were the direct product of the unlawful search of King's apartment. The first search and seizure being lawful, information thereby gained was properly considered in the second affidavit. Therefore, the motions as to all evidence seized under warrant from either apartment are denied.

## VIII

### MISCELLANEOUS PROCEDURAL MOTIONS

Also arising in this case were certain procedural motions which this Court was called upon to decide. These will be dealt with briefly at this time.

A. *Motion to Disclose Informer's Identity*

■ Defendants Thieda, Vesco, and Virginia Pope move the Court to order the United States Attorney to disclose the identity of the confidential informant upon whose information the electronic surveillance authorization was obtained. It was argued that the status of the informant is such as to justify a limitation upon the Government's privilege of nondisclosure, in that he might have information crucial to the defense's case. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The Government strongly contested the materiality of the informant's identity to the defense, representing that he was neither a participant nor a percipient observer in the offenses charged. In order to justify disclosure, evidence must be presented from which the Court may infer that the informant has relevant information. United States v. Gibbs, 435 F.2d 621 (9th Cir. 1970), and United States v. Estrada, 441 F.2d 873 (9th Cir. 1971).

■ In order to ascertain whether the informant's identity had to be disclosed, this Court determined to conduct an *in*

*camera* interview with the informant in the presence of a court reporter, as has been approved in Durham v. United States, 403 F.2d 190 (9th Cir. 1968), and Parker v. United States, 407 F.2d 540 (9th Cir. 1969). Questions were solicited from defense counsel. The interrogation was conducted under oath. From the information gathered during that interview the Court finds that the informant is neither a necessary nor percipient witness to the conspiracy or other transactions alleged in the indictment nor would he be of *any* assistance to the defense. I also find that he is in extreme fear for his life, with or without a basis in fact. Therefore, the motion for disclosure of the informant's identity is denied. The transcript of the interview as well as the reporter's notes are ordered sealed and are to be opened only by an appellate court, should it then be deemed necessary.

### B. *Motion to Compel Election*

 Initially, Maack seeks to have the Government compelled to elect the law under which it will proceed to trial in Count 1. The problem arises because the conspiracy alleged in the first count is one to violate not only certain sections of Title 21, United States Code which have now been repealed, but also those sections which replace them. Were the defendants charged with violating each of the several sections enumerated in the indictment, defendant's duplicity argument might be well taken. In this prosecution it is misplaced. A single criminal conspiracy designed to accomplish several unlawful objectives is alleged in the first count, and the defendants may be convicted, if at all, for a single criminal act. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Diaz–Rosendo v. United States, 357 F.2d 124 (9th Cir. 1966), cert. denied 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966).

Sentencing could present a problem in a situation such as this since the penalties imposed under the old law were more substantial than may be now imposed.

This would be acute if a defendant did not join the conspiracy until after the repeal of the old law. The Court does not consider these problems insurmountable, as a form of special verdict may be utilized to determine the time each defendant became involved. Additionally, in light of United States v. Stephens, 449 F.2d 103 (9th Cir. 1971), this Court believes it may impose sentences conforming to the mandate of present law even in cases of conspiracy to violate provisions of the former law.

 Secondly, Maack attacks the provisions of 21 U.S.C. § 801 et seq. as being unconstitutionally vague, seeking to have Count 1 dismissed. His argument on this point is far more vague than the statutory provisions could ever be. This Court finds the act clear and intelligible and counsel's motion spurious. Were he correct, the count would survive as being based on 21 U.S.C. § 176a.

### C. *Motion for Handwriting Exemplars*

The Government moved to have this Court order each named defendant to provide handwriting exemplars in order to establish the authorship of several handwritten or printed documents in the Government's possession. After further consideration, the motion was withdrawn at this time without prejudice to its being renewed at some later date.

### D. *Motions for Severance and Separate Trial*

 Defendants Olson, Swisher and Virginia Pope move for severance of defendants and for separate trials. The Court finds that joinder of defendants in Indictment No. 11627 was proper under Rule 8(b) of the Federal Rules of Criminal Procedure, as each is alleged to have participated in the same series of acts or transactions which constitute the offenses charged. Substantive and conspiracy counts are properly joined, Baker v. United States, 393 F.2d 604 (9th Cir. 1968), and each named defendant need not be charged in each count. Mendez v. United States, 349 F.2d 650 (9th

Cir. 1965), cert. denied 384 U.S. 1015, 86 S.Ct. 1952, 16 L.Ed.2d 1036 (1966).

Rule 14 allows discretionary severance of properly joined defendants if the moving party can demonstrate that substantial prejudice will result from a joint trial. United States v. Cozzetti, 441 F. 2d 344 (9th Cir. 1971). Defendants claim prejudice from joinder as follows: (1) each may refuse to testify, and counsel for co-defendants may attempt to comment on such refusal in order to protect the best interests of their client, thus giving rise to a problem similar to that in De Luna v. United States, 308 F.2d 140 (5th Cir. 1962); (2) the converse of the above arises if the Court refuses to allow adverse comment on a co-defendant's silence; (3) statements of co-defendants who will not testify may be introduced to inculpate another defendant so as to violate the rule in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); (4) some evidence may be introduced against a co-defendant which could not be used against a movant in a separate trial; and (5) a fair trial is impossible if all are tried together because the interests of each are distinctly adverse, one may not compel a co-defendant to testify in movant's behalf, and the jury would be confused by a complexity of the issues and thus would be unable to consider guilt or innocence of any one defendant without considering that of co-defendants.

Under a Rule 14 motion a court must balance the inconvenience and expense both to the Government and the judicial system caused by separate trials, against the prejudice to the defendants inherent in a joint trial. The problem on both sides of the balance is complicated by the fact that this is a large conspiracy case in which the movants are burdened with demonstrating the potentiality for substantial prejudice. Williamson v. United States, 310 F.2d 192 (9th Cir. 1962). This Court does not read the balance in the instant case in favor of the defendants.

Several forms of suspected prejudice may be cured, if they in fact arise, by proper instruction to the trier of fact. Others would continue to exist even during a separate trial, e. g., one could not be forced to testify at any time if the result would be self-incrimination. And issue complexity would continue to appear.

Prejudice based on *Bruton* is prematurely raised, as the Government assures this Court that they will adhere strictly to that decision. Should the need arise for the use of extrajudicial statements of co-defendants, the Government will then move to sever. In the alternative, all references to co-defendants may be successfully deleted from the statements sought to be admitted. Posey v. United States, 416 F.2d 545 (5th Cir. 1969).

This Court recognizes that adverse comment by counsel upon a co-defendant's election not to testify impinges upon the free exercise of that right, and that when such comment is necessary, severance must be ordered. De Luna v. United States, *supra*. Rather than sever, this Court adopts the alternative approach of United States v. De La Cruz Bellinger, 422 F.2d 723 (9th Cir. 1970), cert. denied 398 U.S. 942, 90 S.Ct. 1860, 26 L.Ed.2d 278 (1970), and does now specifically order that no adverse comment on any co-defendant's failure to testify will be permitted. All counsel are advised to comply scrupulously with this order.

Neither the allowance nor the restriction of such adverse comment creates a situation requiring severance *pro se*. One denied the right of comment must demonstrate probable prejudice or benefit in the presentation of his defense which would result from comment. This Court will allow additional motions for severance or do so *sua sponte* should substantial prejudice appear while trial is in progress. The motions are at this time, however, denied.

Additionally, Olson moves for separate trials as to the counts under which he was indicted under 11257. Under

11627, Olson is included in the conspiracy and three counts under 18 U.S.C. § 1403(a), and I will consider the earlier motion in light of the new indictment. Dual bases for severance of counts are urged: (1) Olson may wish to give testimony in defense to one, and (2) presenting separate defenses will embarrass the defense of Olson and the jury will be unable to consider the several counts individually.

 This motion is denied because Olson has not satisfied this Court that any prejudice will result from a common trial of all counts. In Baker v. United States, 131 U.S.App.D.C. 7, 401 F.2d 958 (1968), the court limited the severance rule of Cross v. United States, 118 U.S.App.D.C. 324, 335 F.2d 987 (1964) under which Olson's first basis is raised. The *Baker* court held a defendant seeking severance of counts must make a convincing showing that (1) he has important testimony to give upon one count, and (2) a strong need to not testify on the other count. This must include evidence regarding the nature of his proposed testimony on one count and reasons for not desiring to testify as to the other count. Nor am I satisfied that the second basis for severance has substance.

E. *Change of Venue*

 Olson moves for a change of venue based on the fact that the *Mercy Wiggins* was seized in the Northern District of California. This Court holds that venue is properly founded in the Southern District of California. Most of the overt acts alleged in the indictment in furtherance of the conspiracy occurred in this district and each substantive count under 18 U.S.C. § 1403(a) allegedly occurred here. The motion is denied.

It is so ordered.