CLIFTON SPEASE AND WILLIE ROSS v.
STATE OF MARYLAND

[No. 419, September Term, 1973.]

*Decided May 21, 1974.*

270

The cause was argued before MOYLAN, GILBERT and LOWE, JJ.

*Fred Warren Bennett* for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Elias Silverstein, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, Clifton Spease and Willie Ross, were convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge Robert B. Mathias, of conspiracy to distribute cocaine. Ross was sentenced to a term of 20 years and Spease, to one of 15 years.

The prosecution was the latest episode in the continuing effort of Prince George's County authorities, spearheaded by Detective Elmer L. Snow, to crack the higher echelons of the apparatus behind the widespread trafficking in illicit drugs in that county. The evidence at bar is permeated with familiar names from *Peterson, Deal and Hunt v. State,* 15 Md. App. 478, 292 A. 2d 714, and *Soles v. State,* 16 Md. App. 656, 299 A. 2d 502.

The first of six assignments of error goes to the denial of the appellants' pretrial motion to suppress incriminating conversations seized by a court-ordered wiretap. A resume of the probable cause for the issuance of the wiretap order will help place the ensuing discussion of the manner of execution of that order in factual perspective.

The focus of the investigation was upon the appellant

Ross. The appellant Spease was caught up in the net thrown about Ross.

The wiretap order now under review was issued by Judge Ernest A. Loveless, Jr., on December 8, 1971. The probable cause therefor was contained in the affidavit of Detective Snow. The probable cause began accumulating on April 8, 1971, and continued to accumulate over the ensuing eight months. It was learned that Ross, who lived at 7404 Walker Mill Road in the District Heights area of Prince George's County, was a major dealer for the heroin which permeated the Fairmont Heights section of that county. He was the wholesale supplier for Daniel Deal, Shandy Richardson, Jr., Artemus Logan and James Arnett.[1] Throughout the spring of 1971, Ross's *modus operandi* was for his retailers to come to his apartment at 7404 Walker Mill Road to purchase their uncut heroin in wholesale quantities. They would then and there "cut" or dilute the drugs for eventual resale. A discreet surveillance put both the appellant Ross and Daniel Deal together at that address on May 3, 1971.

Ross's 1967 Cadillac was also observed parked on occasion at the intersection of 61st Street and Eastern Avenue in Fairmont Heights, an intersection frequently used by drug users as a distribution point. The community there is known as "Junky Hill".

Information coming in from the Narcotics Squad of the Washington Metropolitan Police revealed that Ross had sold $900 worth of heroin to a government undercover agent on May 15, 1971, from an address at 7282 79th Avenue in Landover, Prince George's County. A second sale of $500 worth of heroin was made to the same undercover agent on June 5, 1971. This second sale was made from a 1969 Buick, with District of Columbia personalized tags TJS, which Buick had been observed three days earlier, on June 2, 1971, parked in front of Ross's apartment. The heroin obtained on

---

1. On unrelated charges, Deal was convicted of the distribution of heroin and received a sentence of 20 years. Richardson, charged with the same offense occurring on April 6, 1971, entered a plea of guilty to the charge of simple possession. Logan was convicted *in absentia* at the same trial, but was not sentenced since he absented himself from the final stages of the trial and has not reappeared. *Peterson, Deal and Hunt v. State, supra.*

both May 15 and June 5 was chemically analyzed to be 9.1% pure, a quality of definitely wholesale strength. Street heroin almost universally tested out to be of a strength of 2% or less. On July 13, 1971, the undercover agent who had made the purchases of May 15 and June 5 was shot.

Detective Snow arrested Ross on July 13, 1971, on two charges of distribution of heroin to the undercover agent. Detective Snow confirmed Ross's address as of that time as 7404 Walker Mill Road.

On November 17, 1971, Detective Snow learned reliably that Ross was still dealing heavily in both heroin and cocaine. As a result of the July 13 arrest, however, Ross had radically changed his *modus operandi*. He was apprehensive of police interference and no longer kept the drugs at his home A prospective purchaser would have to telephone Ross at home. Ross would then direct the purchaser to go to a specified location. Ross would then call a third person to meet him and the purchaser at that location. The third person would bring the drugs from its rotating "stash". The designated meeting places would generally be a motel or a location in Palmer Park, Maryland. Discreet surveillance had picked up the appellant Ross, the appellant Spease, one Gloria Holmes and an unknown fourth person at the Howard Johnson's Motel in Cheverly on October 3. Gloria Holmes was a known addict. Police records revealed that narcotics complaints had been lodged against Spease. A records check with the Howard Johnson's Motel revealed that Ross had been a frequent guest there.

It was established that Ross, post-July 13, would sell drugs only to retail dealers and only in wholesale quantities. He would have no contact with ultimate users. The drugs sold would be of an unadulterated, higher quality and the sales usually involved sums of money in excess of $500. Ross would deal only with persons known to him. Automobile surveillance turned out to be unavailing. Ross regularly used evasive driving techniques — driving around the block several times watching in his rear-view mirror, making unexpected U-turns in the middle of little-traveled streets, etc. To discourage even neighborhood surveillance, Ross had

installed a closed circuit television camera mounted on a house across the street, focused on his own apartment with a monitor inside the apartment. After the *modus operandi* changed on July 13, even Detective Snow's highly credible confidential source was cut off from direct contact with Ross. The entire operation had gone telephonic.

On December 8, 1971, Judge Loveless issued the order authorizing Detective Snow, and necessary assistants, to tap Ross's home phone, placing the tap as soon as feasible after 4 p.m. on December 10, 1971, and continuing the tap through 8:30 p.m. on December 24, 1971. Because the investigation was aimed at all possible buyers in the network emanating from Ross and also at the unknown supplier of Ross, the order provided that the interception should not automatically terminate when some incriminating evidence had been obtained but should continue until all aspects of the illicit operation had been revealed. The tap was placed at 12:25 p.m. on December 11. Progress reports were made to Judge Loveless on the fifth, tenth and fifteenth days of the intercept. On December 16, the State's Attorney reported to the judge that during the first five days of the tap, 130 telephonic interceptions had been made, of which total approximately 25 calls were believed to be involved in the drug conspiracy. Surveillances were then established at a number of locations revealed by the intercepted calls. On December 21, the State's Attorney reported to the judge that during the second five days of interception, approximately 234 telephonic interceptions had been made, of which total approximately 20 phone calls were believed to be involved in the conspiracy. On December 27, the final report to the judge revealed that during the last four days of the intercept, approximately 190 telephonic interceptions had been made, of which total approximately 10 calls involved conspiratorial operations.

The order to intercept the telephonic communications was issued in full compliance with Art. 35, Sec. 94, of the Annotated Code of Maryland, and with Title III, Omnibus Crime Control and Safe Streets Act of 1968, Chapter 119, Title 18, United States Code, §§ 2510-2520. The appellants do

not challenge the constitutionality of the statutes authorizing wiretaps. See *State v. Siegel,* 266 Md. 256, 292 A. 2d 86; *State v. Siegel,* 13 Md. App. 444, 285 A. 2d 671; *Pennington v. State,* 19 Md. App. 253, 310 A. 2d 817. Nor do the appellants challenge the facial adequacy of the wiretap order itself. There is, therefore, no initial inadequacy tainting all subsequent police action under the order, as in *State v. Siegel, supra,* or in *State v. Lee,* 16 Md. App. 296, 295 A. 2d 812.[2] The appellants confine their attack to the manner in which the order was executed. They are chagrined in two regards.

They claim that the police, in executing the order, failed to comply with Title 18, § 2518 (5), which provides, *inter alia:*

> "Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . ."

Additionally, they claim that the police also failed to comply with § 2518 (8) (d), which provides, in pertinent part:

> "(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518 (7) (b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of—

---

2. It was in this regard that the Court of Appeals said in the *Siegel* case: "The statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path," and we said in the *Lee* case: ". . . the procedure required by the federal act must be strictly followed and . . . a substantial compliance [is] insufficient." We are not here faced, however, with the legitimacy of the authorizing order itself and do not, therefore, feel that language pertinent thereto is necessarily controlling when reviewing every subsidiary action taken in execution of an order which does meet all constitutional requirements.

(1) the fact of the entry of the order or the application;

(2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and

(3) the fact that during the period wire or oral communications were or were not intercepted."

### The Minimization Question

### The Compliance Issue

In our judgment, the appellants cannot prevail in their contention that the failure to minimize the interceptions mandated the suppression of incriminatory conversations. We believe this is so for two reasons. In the first place, we hold, as did Judge Mathias below, that the State did not fail to comply with that portion of Judge Loveless's order which provided that the wiretap should be:

"conducted in such a way as to minimize the interception of communication not otherwise subject to interception."

The evidence produced at the suppression hearing was somewhat skimpy as to the usual use made of the telephone located at 7404 Walker Mill Road. We have simply the raw statistics as to the total number of calls, averaging out to 40 per day. No information was provided as to what adults, if any, other than Ross lived at 7404 Walker Mill Road and as. to what use they might typically make of the phone. No information was provided as to the number of children in the apartment or as to their normal use of the phone. No information was provided as to Ross's telephone habits in general or as to his specific use of the telephone during the period of the intercept for non-criminal purposes. The "improper invasion of privacy" posited by the appellants is presented to us as a nakedly abstract proposition.

Detective Snow testified that four agents maintained a seven-day-a-week, twenty-four-hour-a-day monitoring regimen, working in twelve-hour shifts. The listening post

was established at a Holiday Inn near the Andrews Air Force Bas?. Whenever the telephone receiver at 7404 Walker Mill Road was picked up, a voice activator at the listening post automatically triggered a Sony tape recorder. The human monitors would enter into a log book the name of the agent supervising the interception at that moment, the time of the call, the fact of whether the call was an incoming one or an outgoing one, the footage on the tape recorder at the time the call began, and such basic characterizations as whether the call was personal or drug-related, etc. Two basic operations were involved in the interception process — (1) the monitoring of the conversation by the human agent and (2) the recording of the conversation on tape. Although all calls were listened to by the agents, Detective Snow testified that the tape recorder was turned off whenever it became clear that the call was completely innocent in nature. Even as to the act of listening, he testified that he "never really paid attention to what children were saying once [he] knew that it was from a child to a child." Presumably, he kept even an inattentive ear "at the half-cock" lest an adult suddenly replace a child on the instrument.

As to the necessity for maintaining the human monitoring on facially innocuous conversations, Detective Snow explained that "when a drug code is used or replacement words are used for an actual narcotic, it only takes one word or two words to throw into a conversation where we would know that it was a drug conversation or drug related." In a lexicon where "girl," "doll," "she," and "the baby" means "cocaine"; where "boy," "horse," "Harry," and "ship" means "heroin" and where "I got that thing" means "The contraband has been delivered," the normal measure of innocuousness is severely strained.

Detective Snow affirmatively testified that no conversation with an attorney, with a clergyman, with a psychiatrist or with a medical doctor was ever intercepted. We believe that the turning off of the tape recorder on clearly non-criminal conversations and the essential "tuning out" on the children's conversations represent a bona fide attempt at as much minimization as the investigative

problem would allow. There was no evidence that conversations between adults other than Ross were ever intercepted. We are persuaded that the degree of vigilance here employed, in dealing with a cautious and chary operative involved in a subtle and widespread conspiracy, was not unreasonable.

In judging the reasonableness of the tactical decisions made by an investigator in the field, hindsight is no criterion. The on-the-spot dilemma facing the investigator is well summarized in *United States v. LaGorga*, 336 F. Supp. 190 (W.D. Pa. 1971), at 196:

> "[I]t is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. It is certainly not unusual for two individuals using the telephone to discuss social matters or items of general interest before getting to the precise point which is to be covered in the call. Similarly, when a call is made to a residence, the telephone is often answered by a young child who will turn it over to one of the adult members of the household at some point in the conversation. It is also rather common that a telephone conversation initially between two children will later develop into a discussion between adults.
>
> . . . .
>
> It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take. It is also true that, during the early part of the surveillance, it was necessary for the agents to familiarize themselves with the voices of those who were working with the defendants." [3]

---

3. In *LaGorga*, the court found that government agents had not made an adequate effort to comply with the minimization order. It went on to hold,

In holding that the minimization order before it had been reasonably complied with, *United States v. Bynum,* 360 F. Supp. 400 (S.D.N.Y., 1973), found an important factor to have been the periodic progress reports made to the judge who had issued the order and his continuing supervision of the course of the investigation. It eschewed reliance on mere statistical analysis, at 410:

> "This focus on reasonableness necessarily forces a case-by-case analysis. . . . A review of reasonableness primarily involves a careful appraisal of circumstances and not merely a mechanical deference to the suggestive weight of statistics. Even the fact that 100% of the calls made or received during the limited period of surveillance were intercepted, if. this were established, though significant, should not be overestimated. The determination of whether minimization was achieved in a particular case requires close scrutiny of, *inter alia,* the type of criminal enterprise being investigated; the scope of that enterprise and the number of participants, known and unknown, involved therein; the number of days for which electronic surveillance is conducted; the scope of the authorizing order; "

The United States Court of Appeals for the 8th Circuit gave careful attention to the minimization problem in *United States v. Cox,* 462 F. 2d 1293 (1972). In that case, 20 days of continuous surveillance produced 90 reels of recorded conversations. Many irrelevant conversations were apparently recorded. The court felt that significant factors in the minimization effort were that the judge had limited the order to 20 days rather than the permissible 30 days; that no renewal of the order was requested; that he required a status report from the United States Attorney at five-day intervals during the period of the intercept; and that he

---

however, that even such non-compliance mandated only the suppression of the innocent conversations, which should not have been seized, and not the suppression of the inculpatory conversations, which were legitimately seized.

gathered an inventory of all taped conversations and promptly sealed both the tapes and the log book. The facts are remarkably similar to those at bar. The court there quoted, at 1300, from the favorable committee report on the subject of minimization, prior to the enactment of 18 U.S.C. § 2518 (5):

> "Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance ... What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance." Senate Report No. 1097, 1968 U.S. Code Cong. & Adm. News, at 2190.

In applying the intent of the framers to the minimization question then before it, the court went on, at 1300-1301:

> "Accordingly, where, as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value."

For other cases holding that minimization orders had been complied with and discussing the nature of the minimization question, see *United States v. Fino*, 478 F. 2d 35 (2nd Cir. 1973); *United States v. Tortorello*, 480 F. 2d 764 (2nd Cir. 1973); *United States v. Focarile*, 340 F. Supp. 1033 (D. Md. 1972); and *United States v. Sklaroff*, 323 F. Supp. 296 (S.D. Fla. 1971).

We hold that there was adequate compliance with the minimization order in the case at bar.

### The Minimization Question
### The Sanction Issue

Our ultimate holding that Judge Mathias was not wrong in denying the motion of the appellants to suppress incriminatory conversations would not be otherwise, however, even if we were to assume that Detective Snow, and his fellows, had failed to comply with the minimization order. We add the cautionary note, however, that our holding is limited to a situation such as that at bar, where at least a bona fide effort at minimization was made (again assuming that it was not adequate). We do not imply that total suppression might never be involved as a sanction, were the police utterly to flout a minimization order. See the distinction made in n. 4 *infra* between mere failure to minimize adequately, on the one hand, and blatant disregard of the minimization order raising the issue to constitutional dimensions, on the other hand. We are clearly not dealing with such blatant action here, however, even assuming technical non-compliance.

There is a division of authority in the country as to whether a failure to minimize requires simply the suppression of the conversations which should not have been seized or whether it requires a suppression of everything seized under a particular order, including clearly incriminatory conversations which were not the object of the intended minimization. The appellants rely upon *United States v. Scott,* 331 F. Supp. 233 (D.D.C. 1971), and *United States v. Focarile, supra. Scott,* in dealing with a situation where there was a blatant refusal to make any even minimal effort at minimization, held that all conversations seized under that particular wiretap must be suppressed. The factual situation in *Scott* was an extreme one:

> "The surveilling agents did not even attempt 'lip service compliance' with the provision of the order and statutory mandate but rather completely disregarded it. The record is devoid of any attempt, no matter how slight, to minimize the interception of unauthorized calls. In fact when Agent Cooper

was asked if he could point to 'any discretion exercised by any agent at any time that resulted in * * * non-recordation * * * ' He answered, 'I cannot, sir.' " 331 F. Supp. at 247.

In *Focarile*, Judge Miller reasoned that total suppression was the appropriate sanction, but did so in an extended dictum. He went on to hold that the government agents there had, indeed, complied with the minimization order, so that no sanction was ultimately required.

The great weight of authority and, in our judgment, the sounder reasoning maintains that the failure to minimize requires only the suppression of those conversations which should not have been seized and not the suppression of those conversations which were appropriately seized. Indeed, analogy to general Fourth Amendment experience dictates such a result. Wiretapping and electronic eavesdropping problems are fundamental Fourth Amendment problems. *Berger v. New York*, 388 U. S. 41, 87 S. Ct. 1873, 18 L.Ed.2d 1040 (1967), simply extended the coverage of the Fourth Amendment, holding that words were subject to seizure just as more palpable items had always been. Whether dealing with conversations or with tangible items, the issue is one of particularity—that language of the Fourth Amendment stating that the only valid warrants are those "particularly describing . . . the things to be seized." The classic case on point is *Marron v. United States*, 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231 (1927). In that case, certain ledgers and other papers not particularly described in a search and seizure warrant were held to have been improperly seized under the warrant; other items which had been particularly described, however, were admitted into evidence. More recent applications of the *Marron* principle, mandating only the partial suppression of things wrongfully seized and not derogating from the admissibility of those things rightfully seized, are *United States ex rel. Nickens v. LaVallee*, 391 F. 2d 123 (2nd Cir. 1968); *United States v. Dzialak*, 441 F. 2d 212 (2nd Cir. 1971); and *Brooks v. United States*, 416 F. 2d 1044 (5th Cir. 1969).

The wiretap cases generally acknowledge the clear analogy to more general Fourth Amendment principles. *United States v. LaGorga, supra,* said, at 197:

> "It seems clear under the general law of search and seizure that if some of the items obtained satisfy the requirements of the law, the mere fact that other objects beyond the permissible ambit of the search must be suppressed, does not require that all of the evidence must be necessarily so treated."

*United States v. Cox, supra,* made the analogy explicit, at 1304:

> "Obviously an electronic search extending over a period of time will encompass overhearing irrelevant conversations, but the search of a building will likewise involve seeing and hearing irrelevant objects and conversations."

See also *United States v. Escandar,* 319 F. Supp. 295 (S.D. Fla. 1970); *United States v. Langford,* 303 F. Supp. 1387 (D. Minn. 1969); *United States v. Thweatt,* 433 F. 2d 1226 (D.C. App. 1970); *Stanley v. Georgia,* 394 U. S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969) (concurring opinion by Stewart, J.).

Beyond the application of general Fourth Amendment principles to the problem, a second argument strongly commends itself to us—the inappropriateness of extending the sanction of the exclusionary rule in an area where viable alternatives have been provided. That we have the freedom to interpret in this area is clear from the circular and ambiguous provisions of Title III as well as from the example of all our sister jurisdictions, who have felt that they had the freedom to opt for or against total exclusion as a matter of judicial policy. One starts with § 2515 of the federal law:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury,

department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

In deciding what disclosures are not violations of the chapter, one must turn, for present purposes, to § 2517 (2):

"Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties."

In deciding, then, whether the law enforcement officer has acted "by any means authorized by this chapter," one turns to § 2518 (5) which provides, *inter alia*:

"Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . ."

The procedural steps are made clear by § 2518 (10) (a), which provides, in pertinent part:

"Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval."

One thing is clear; if there has been a bona fide effort at minimization, even an inadvertent and unanticipated seizure of a conversation not particularly described in the wiretap order and not related to the subject of the investigation, but otherwise incriminatory on some other subject, would be admissible in evidence. It is equally clear that if there has been no bona fide effort at minimization, such improperly seized conversations shall not be admitted in evidence. The present problem is more complex. Whether the improper "interception of communications not otherwise subject to interception" will somehow taint the interception of communications which were properly subject to interception, thereby divesting the investigator of the protection of § 2517 (2), thereby making his disclosure of that information a "violation of this chapter" under § 2515 and thereby requiring its suppression under § 2518 (10) (a) is the point to be resolved. The legislative intent is by no means clear and we do have range within which to apply judicial policy.

In the ongoing debate for and against the exclusionary rule from *Weeks v. United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), through *Wolf v. Colorado,* 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), and *Elkins v. United States,* 364 U. S. 206, 80 S. Ct. 1437, 4 L.Ed.2d 1669 (1960), to *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), even the champions of the exclusionary rule acknowledged that it was a blunt and awkward instrument, ultimately relied on out of sheer necessity only because alternative methods of putting teeth in the Fourth Amendment had not been provided. *Linkletter v. Walker,* 381 U. S. 618, 85 S. Ct. 1731, 14 L.Ed.2d 601 (1965), pointed out that the purpose of the rule was simply prophylactic—that of "general deterrence." *Bivens v. Six Agents,* 403 U. S. 388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971), reiterated that a terrible price was paid in the loss of trustworthy evidence and that the rule was tolerated only

because of the absence of workable alternatives. See generally our discussion in *Everhart v. State*, 20 Md. App. 71, 83-90, 315 A. 2d 80, 89-92.[4]

With respect to wiretapping violations, however, Title III is not dependent upon the exclusionary rule for its enforcement but has braced itself with strong and explicit sanctions, civil and criminal. For the criminal sanction, § 2511 (1) provides, in pertinent part:

> "Except as otherwise specifically provided in this chapter any person who—
>
> (a) willfully intercepts . . . any wire or oral communication; . . .
>
> shall be fined not more than $10,000 or imprisoned not more than five years, or both."

By way of additional civil sanction,[5] § 2520 provides, in pertinent part:

---

4. All of the procedural strictures of Title III may not necessarily have the benefit of *Mapp v. Ohio*. There is some uncertainty as to whether a violation of a minimization order is constitutional in dimension or is merely a violation of a congressional statute, in which case the right of the Congress to impose an exclusionary rule of evidence upon the states for statutory violations of non-Constitutional dimension is highly problematical, notwithstanding the gloss of *Lee v. Florida*, 392 U. S. 378, 88 S. Ct. 2096, 20 L.Ed.2d .1166 (1968). In Note, *Minimization: In Search of Standards*, 8 Suffolk L. Rev. 60 (1973), it is argued that it may be either depending on degree:

> " [T]otal exclusion must be reserved for those instances of surveillance which have attained the level of indiscriminate 'general searches.' All other situations require partial suppression — *i.e.*, suppression of *all* nonpertinent calls." p. 62.
>
> . . .
>
> "In the ordinary case minimization is merely a statutory, not a constitutional, mandate. But when surveillance becomes so indiscriminate as to amount to a 'general search,' not only the statute, but, more significantly, the Constitution is violated." pp. 63-64.

*United States v. Focarile, supra*, implies the same dichotomy at p. 1046 and in n. 3, suggesting that perhaps "the Fourth Amendment requires a lesser degree of minimization than Title III."

And see *Pennington v. State, supra*, 19 Md. App. at 277-279, and particularly n. 15 and n. 17. N. 15 reads, "Exclusionary rules have been fashioned by the courts for violation of constitutional rights. . . . As we have seen, no constitutional right is here involved."

5. Interesting in this regard is *United States v. LaGorga, supra*. Although acknowledging that "We are much concerned about the large

"Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred."

If the words of the Supreme Court in *Mapp* and related cases to the effect that the exclusionary rule is reluctantly and grudgingly resorted to only because of the total absence of viable alternatives to deter Fourth Amendment violations have any vitality at all, our extension of the exclusionary rule into questionable Title III areas, where strong

---

volume of innocent, irrelevant, and private conversations intercepted in the course of this electronic surveillance," at 195, it held "that complete suppression of all the interceptions, including those which would provide evidence against the defendants is not indicated and will not be ordered." p. 197. It pointedly, however, referred to § 2520 as an available remedy for governmental overreaching, commenting at 197:

"However, such annoyance as might be caused by the interception of calls of innocent persons in this case should not be permitted to continue any longer. We will suppress only the evidence pertaining to the irrelevant conversations and order that the transcripts and portions of the tape of those interceptions be impounded. Furthermore, an additional inventory shall be prepared by the Government and served upon all individuals not in the defendants' households whose irrelevant conversations were monitored.

We believe that in taking this action due respect will be accorded the Congressional intent to provide a specific remedy of civil damages in § 2520 to those whose communications may have been intercepted in violation of the law. If the aggrieved parties wish to file a suit for damages, then the alleged offending tapes may be released for use as evidence."

See also *United States v. Iannelli*, 339 F. Supp. 171 (W.D. Pa. 1972), at 173.

alternative deterrents have been provided,[6] would do violence to the spirit of the Supreme Court. They have consistently told us that trustworthy evidence should only be forsaken out of sheer necessity, when prophylaxis cannot be achieved by any other means.

The reasoning of those cases which reject total suppression is well set out in *United States v. King,* 335 F. Supp. 523 (S.D. Cal. 1971). In *King,* there was a clear failure to minimize interceptions:

> "The wiretap on King's telephone was in effect for a total of forty-five days, twenty-four hours a day. It was the testimony of Agent Martin that during that time every communication that came across the tapped wire was recorded, regardless of who the parties were or the nature of the conversation, while an estimated ninety percent of the phone calls were monitored by the surveilling agents." p. 540.

There were also, however, validly seized conversations:

> "While it is true in this case that a substantial portion of the 1556-page wiretap transcript represents unauthorized interceptions, it must be emphasized that the rest was monitored and recorded by Customs agents in compliance both with the statute and the authorizing order." pp. 543-544.

*King* rejected the reasoning of *United States v. Scott, supra,* and looked rather to general Fourth Amendment principles, pointing out that total suppression was appropriate only when the authorizing order itself was void *ab initio*:

> "This Court takes issue with this position as having

---

**6.** For the effectiveness of the civil remedy, see *Kinoy v. Mitchell,* 331 F. Supp. 379, 382 (S.D.N.Y. 1971). And see *Alderman v. United States,* 394 U. S. 165, 175, 89 S. Ct. 961, 22 L.Ed.2d 176, 187-188 (1969): "Nor should those who flout the rules escape unscathed. In this respect we are mindful that there is now a comprehensive statute making unauthorized electronic surveillance a serious crime . . . Without experience showing the contrary, we should not assume that this new statute will be cavalierly disregarded or will not be enforced against transgressors."

no legal basis, preferring to consider wiretaps within the framework of the general law of search and seizure and to follow its principles. . . .

Throughout its history, whenever application of the exclusionary rule has resulted in total suppression of evidence in a criminal prosecution, it has been because the entire search and seizure was considered tainted by some violation of Fourth Amendment rights. . . . This was the case even in *Berger v. New York, supra,* and *Katz v. United States, supra,* the two decisions having the most significance in the genesis of constitutionally-approved electronic surveillance. In *Berger* the New York statute which authorized the electronic eavesdrop was adjudged unconstitutional so that no search pursuant to that statute could be valid either in whole or in part. Likewise in *Katz* an otherwise validly executed 'bug' was considered a violation of the Fourth Amendment because not authorized by a judge. The entire search was void *ab initio*.

The case presently before this Court is of a different nature. Here we have a constitutional statute and a valid warrant (authorizing order) issued thereunder. In its execution, however, some, but not all, of the evidence seized lay beyond the scope of the warrant." p. 544.

*King* looked to *Marron v. United States, supra,* and to cases in the lower federal courts applying *Marron* and to the provision of Federal Rule 41 (e):

" [T]he reasoning employed, based on the language of Rule 41(e) of the Federal Rules of Criminal Procedure, is persuasive. That Rule provides that if '*the property* seized is not that described in the warrant,' then '*the property* shall be restored unless otherwise subject to lawful detention and *it* shall not be admissible in evidence at any hearing or trial.' (Emphasis added.) This language would

seem to require an item-by-item consideration of the warrant and the items seized during the search pursuant thereto. With the exception of *Scott*, defense counsel has cited us to no contrary opinion, nor could our own research discover any. Combined with the above-quoted language of Rule 41(e), this indicates to the Court that in the ordinary case, the seizure of some items of evidence in excess of those specified in a search warrant does not result in the suppression of those items which were validly seized." pp. 544-545.

*King* finally concluded that § 2518 (10) and Rule 41 (e) were similar in application:

"It is our belief that with no higher court authority to the contrary, this principle applies as well to wiretaps under Title III, 18 U.S.C. § 2510 et seq. Section 2518 (10) (a), the section that addresses itself to motions to suppress interception, like Rule 41(e), may be considered as support for this position. The language here provides that any aggrieved person 'may move to suppress the contents of any intercepted wire or oral *communication*, or evidence derived therefrom, on the grounds that —

(i) the *communication was* unlawfully intercepted;

(ii) the order of authorization or approval under which *it was* intercepted is insufficient on *its* face; or

(iii) the *interception was* not made in conformity with the order of authorization or approval.' (Emphasis added)

This language, using the singular form throughout, appears to indicate that a motion to suppress may be directed toward one or more allegedly unlawful interceptions, and that if such motion were

granted, suppression of the entire wiretap would not be a necessary consequence.

It is the decision of this Court, therefore, that defendants' motions to suppress the entire contents of the wiretap on the basis of the Government's failure to minimize interceptions are denied." p. 545.

*United States v. Mainello,* 345 F. Supp. 863 (E.D.N.Y. 1972) doubly reinforced the principle of *King.* It dealt first with the effect on validly seized conversations of the failure to minimize, at 877:

"This court finds the reasoning of the *King, Leta,* and *LaGorga* cases most compelling and it entertains grave doubts as to the propriety of the *Scott* decision. Moreover, the *Marron, Nickens,* and *Dzialak* cases, which the defense relies upon, are in fact contrary to the position the defense urges this court to take. They clearly hold that where, in execution of a valid search warrant, material beyond the scope of the warrant is illegally seized, the material validly seized is not tainted and it is properly admissible. Therefore, on the basis of the above decisions, this court suppresses all evidence obtained by electronic surveillance which does not pertain to the offenses of which the defendants were suspected at the time of the issuance of the orders and which were specifically mentioned in the orders. However, those conversations described in the orders were properly transcribed and will be given due consideration by the court."

It then dealt with the more far-reaching allegation that interceptions without any color of authorization had intervened between two valid intercepts. It reasoned that even totally unlawful seizures would not taint lawful seizures immediately preceding and following them, saying at 880-881:

"It is alleged that electronic surveillance was

conducted during the periods from December 8 through December 15, 1970, and from January 6 through January 11, 1971, without authorization and also that the authorized surveillance equipment was not dismantled or removed during these periods. These arguments seem to be the product of pure conjecture: they are unsupported by any statement of facts and circumstances and are of dubious merit. The record clearly indicates that no evidence has been submitted which was intercepted during unauthorized periods. In any event, the alleged invalid interceptions would not invalidate the prior and subsequent valid interceptions."

The United States Court of Appeals for the Eighth Circuit was equally emphatic in *United States v. Cox, supra,* at 1301:

"Furthermore, even if the surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed. Quite the contrary, 18 U.S.C. § 2517 manifests an intent to utilize *all* the evidence obtained by eavesdropping, and § 2517 (5) expressly permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised. Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The non-incriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518 (10) (a), but the conversations the warrant contemplated overhearing would be admitted."

Similar results were reached in *United States v. LaGorga, supra,* 195-197; *United States v. Lanza,* 349 F. Supp. 929, 932 (M.D. Fla. 1972); *United States v. Leta,* 332 F. Supp. 1357,

1360 (M.D. Pa. 1971) and *United States v. Iannelli*, 339 F. Supp. 171, 173 (W.D. Pa. 1972).

For all of the foregoing reasons, we hold that total suppression is not called for. Even the invalid seizure, through failure to minimize, of certain protected conversations would not compel the exclusion of other conversations which were properly subject to seizure.[7]

### The Service of Inventory Question

With respect to the requirement of § 2518 (8)(d) that Ross be served an inventory notifying him of the wiretap within 90 days of December 24, 1971, there is no question that the State did not comply. Neither is there any question, however, that there was substantial compliance. On January 5, 1972, only twelve days into the 90-day period, Ross was served by Detective Snow with a copy of a search warrant and its supporting application and affidavit. The second page of that affidavit recited:

> "That on December 8, 1971 your affiant appeared before the Honorable Judge of the Circuit Court for Prince George's County, Maryland, Ernest A. Loveless. That at that time an Ex Parte was issued by the said Ernest A. Loveless to make and record telephonic interceptions in Prince George's County, Maryland at the phone number 350-2219 during the periods of December 10, 1971 to December 24, 1971 inclusive. That phone number 350-2219 is listed to one Willie NMN, Ross at 7404 Walker Mill Road, District Heights, Prince George's County, Maryland.
>
> On December 21 at 7:40 a.m., a call was made from the phone of Willie Ross to 725-5100, the Colony Seven Motel located along the Baltimore-Washington Parkway in Anne Arundel

---

7. On the minimization question, see generally Linzer, *Federal Procedure for Court Ordered Electronic Surveillance: Does It Meet the Standards of Berger and Katz*, 60 J.Crim.L.C. & P.S. 203 (1969), and Note, *Minimization: In Search of Standards*, 8 Suffolk L. Rev. 60 (1973).

County, Maryland. Willie Ross asked for Room 708 which was also registered on that date in the name of Willie Ross. A Negro male answered the phone in Room 708. Due to past telephonic conversations, affiant recognized the voice who answered the phone to be that of Clifton n/m/n Spease. The conversation went as follows: . . ."

The intercepted conversation was then set forth verbatim.

Lest we lapse into mechanical formalism, it is important to appreciate the broad purpose intended to be served by the rule. That purpose was well stated in *United States v. Eastman,* 326 F. Supp. 1038, 1039 (M.D. Pa. 1971):

"The provision for service on the defendant of an inventory and notice within ninety days of the wiretap is not meaningless. It eliminates, insofar as practicable, the possibility of completely secret electronic eavesdropping and grants to the person involved an opportunity to seek redress for an abusive interception either by a civil action for damages or by a suppression of the evidence in a criminal case."

Measured against that purpose, the substantial compliance at bar satisfied, in our judgment, the intendment of the rule.

The United States Court of Appeals for the Tenth Circuit dismissed a contention that strict compliance was required in *United States v. Smith,* 463 F. 2d 710, 711 (1972):

"The language of this section and the Act's legislative history make it clear that this section is modeled after existing search warrant return practice, i.e. the similar provisions found in Rule 41(d) of the Federal Rules of Criminal Procedure. Cases interpreting the existing law define the filing of the return and filing of a warrant as ministerial acts and failure of strict compliance does not require suppression except upon affirmative showing of prejudice."

In *United States v. Lawson,* 334 F. Supp. 612 (E.D. Pa. 1971), the government failed to make timely service of the inventory. The defendants there argued, as they do here, that § 2518 (8)(d) must be strictly complied with. The court held, at 616:

"Defendants, however, offer no authority for the proposition that procedures under 18 U.S.C. § 2518 should be interpreted in a manner different from existing search warrant practice. Existing practice with regard to returning and filing search warrants is persuasive authority for determination of procedures under § 2518. The return and filing of a search warrant are ministerial acts, *Evans v. United States,* 242 F.2d 534 (6 Cir. 1957), cert. denied, 353 U.S. 976, 77 S.Ct. 1059, 1 L.Ed.2d 1137 (1957), and absent a substantiated claim of prejudice, failure to file a warrant should not invalidate an otherwise lawful search."

The American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Electronic Surveillance, (Approved Draft 1971) dealt with this precise question of inventory filing under 18 U.S.C. § 2518 and stated, at p. 160:

"A failure to make a correct return or to file the inventory, noted below, should result in the suppression of evidence only where prejudice is shown."

*United States v. LaGorga, supra,* dealt with a late filing of an inventory and held that substantial, even if not literal, compliance had achieved the purpose of the section, reasoning at 194:

"The purpose of the notice is obviously to prevent Government abuse and continuing secrecy on the use of wiretaps. In this case, the Court approved the extensions requested upon valid grounds and in due course the inventories were served. The purpose of the requirement, therefore, has been

met and to suppress the evidence on the basis of a clerical oversight having no prejudicial effect would be to unnecessarily undermine and subvert the legislation."

In *United States v. Wolk,* 466 F. 2d 1143 (1972), the Court of Appeals for the Eighth Circuit reversed a District Court decision which had ordered suppression of all conversations as to three defendants who had, through inadvertence, never been served with an inventory. In reversing, the Eighth Circuit held, at 1145-1146:

"The Government argues, and there is no serious contention to the contrary, that the appellees knew of the wiretaps because of the return of the indictment, service of the application, affidavit and order for interception at or before arraignment, the arraignment itself and complete access to the tapes and transcript of the interceptions after the arraignment.

. . .

We do not believe that the use of formal inventories is an end unto itself. Surely neither the Congress nor the constitution would require such emphasis of form over substance as the appellees would have us promulgate. In *Berger v. New York* . . . the Court noted: "This is no formality that we require today . . .' To us the statute is concerned with adequate notice and not formalities. The record demonstrates that the appellees were sufficiently aware of the wiretap so as to be able to seek suppression of the evidence on a number of grounds including the argument that the 'probable cause' requirement of the statute had not been satisfied. The appellees had adequate notice in this case, and they have not shown that any prejudice resulted from the failure of the Government to formally serve them with the inventories. . . .

Inasmuch as the statute has been substantially complied with in that the appellees had actual

notice and the appellees have not been prejudiced by the delay in formal notification, the evidence should not have been suppressed."

The only case we have found to hold otherwise is *United States v. Eastman*, 465 F. 2d 1057 (3rd Cir. 1972). *Eastman* was dealing with an extreme situation, wherein the judge who issued the wiretap order explicitly dispensed with any requirement of notice as a part of the order, ". . . notice to the said Tony DeJest and the said Bonnie Kerr is hereby expressly waived." *Eastman* made clear that it was dealing with an extreme situation, at 1062:

"The touchstone of our decision on this aspect of the case at bar is not one in which an inventory was delayed but rather is one in which specific provisions of Title III were deliberately and advertently not followed. In other words the failure to file the notice or inventory is no mere ministerial act. It resulted from a judicial act which on its face deliberately flouted and denigrated the provisions of Title III designated for the protection of the public. This we cannot countenance."

The unusual facts of *Eastman* make it readily distinguishable from all of the other cases which have dealt with the inventory question and from the case at bar.[8] We do not find it apposite and we do not follow it.

The appellant Spease is in a different posture than is the appellant Ross. He was not named in the wiretap order. With respect to such as he, § 2518 (8)(d) simply provides that an inventory shall be served on "such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice."

---

8. In *Washburn v. State*, 19 Md. App. 187, 198-201, 310 A. 2d 176, 183-184, we dealt with a situation which might have approached the extremes of *Eastman*. A judge postponed notice for "an indefinite longer time." We admonished that " [u]nder such an order, notice, conceivably, might never be given to an accused or other person whose telephone has been tapped, and consequently would thwart the legislative will." The state of the record was not complete enough, however, for us to judge ultimately the propriety of that decision and the case was, in any event, decided on other grounds.

In *United States v. Ripka*, 349 F. Supp. 539 (E.D. Pa. 1972), the court found no infirmity when several defendants who had not been named in the interception order except as "other unidentified persons" did not receive inventories. The court rejected their claim and held that, in any event, they suffered no harm, since under the provisions of § 2518 (9) they were furnished with a copy of the interception order and the application at least ten days prior to trial. Such notice was given to the appellant Spease in this case.

A similar result was reached as to a defendant who had not been named in the order and who had not received an inventory in *United States v. Iannelli, supra,* at 173-174:

" [W]e note that the statute does not require that a notice be served upon each person whose calls have been intercepted. It is sufficient if an inventory is served upon the individual named in the application and such other persons as the judge may determine in his discretion. *Cf.* ABA Standards on Electronic Surveillance, § 5.15.

The purpose of this particular provision is to prevent the Government from carrying on a continuing surveillance without alerting those who would be the subject of the interceptions. In all, inventories were sent to some twenty-one persons, including eight of the named defendants. This is adequate coverage to effect the result intended by the Act. In any event it seems likely that Bruno and the others became aware of the intercept in this case when their acquaintances were served."

We note, moreover, in the case at bar, that both Spease and Ross were represented by the same attorney. We are satisfied that Spease suffered no prejudice through lack of formal notification and that Judge Loveless did not abuse his discretion in not requiring an inventory to be served on Spease. Indeed, Judge Loveless was not even aware of Spease's existence, let alone complicity in the case.

In the final analysis, in looking at the wiretap order and at

its execution, we feel as did the court in *United States v. Bynum, supra,* at 419-420:

> "As with a criminal trial, a defendant is not entitled to perfection in the censorship of what is available to be overheard on the tap; he is entitled to a fair effort from the government agents at not overhearing what is irrelevant to the search. This invokes a judgment quotient on the part of the surveillance agents and requires a determination whether they unfairly abused their authority to listen in.
>
> The important law-enforcement tool provided by Congress and carefully tailored to meet exacting constitutional standards should not be dulled by uncompromising administration to a point of practical ineffectiveness."

### The Severance Question

The appellants' remaining contentions can be disposed of more summarily. Spease alone alleges error in the failure of Judge Mathias to order, sua sponte, a severance for trial purposes of the fourth count (charging a conspiracy between himself, Ross and one Mark Anthony Wiley to distribute cocaine on December 21, 1971) from the four other counts which did not charge him. The first count charged that Ross, on December 15, conspired with unknown persons to distribute cocaine. The second count charged Ross with conspiring with Mark Anthony Wiley to distribute cocaine on December 17. The third count charged Ross with the substantive offense of distributing cocaine on December 17. The fifth count charged Ross with the substantive offense of distributing cocaine on December 21.

Judge Mathias dismissed all others except the fourth because of the legal insufficiency of the evidence to sustain them. For that reason alone, we see little likelihood of prejudice to Spease. We note, moreover, that the critical intercepted telephone conversation between Ross and Spease on December 21 was couched in very cryptic vocabulary. The

testimony to which Spease so strenuously objects, particularly the testimony of accomplice George Bowens, although going more directly to incidents that occurred on other days, nevertheless shed interpretive light on the possibly ambiguous language of the December 21 conversation. In helping to show what Ross was talking about, it helped to show what Ross and Spease were together discussing.

We note, furthermore, that Spease and Ross were represented by the same trial counsel. A joint trial clearly had some financial advantage for Spease. It may have been thought to have had some tactical advantage in showing him to be simply a minor cog in the larger machinery run by Ross.

Of even greater significance to our decision, however, is the fact that Spease at no time requested a severance. The cases he cites of *Wilson, Valentine and Nutter v. State*, 8 Md. App. 653, 262 A. 2d 91, and *Lewis v. State*, 235 Md. 588, 202 A. 2d 370, are not on point, since in both of those cases, severances were affirmatively requested. Maryland Rule 735, although not precluding a judge from ordering severance sua sponte, contemplates that normally such a request will be made by the defendant:

> "If it appears that an accused or the State will be prejudiced by a joinder of offenses or of defendants in an indictment, or by joinder for trial together, the court may order an election or separate trials of counts, grant separate trials of defendants or provide such other relief justice requires. A motion under this Rule may be made only before the jury is sworn, or, where trial by jury is waived, before any evidence is received."

Under all of the circumstances, particularly the failure of Spease to request a severance, we do not feel that there was any abuse of discretion on the part of Judge Mathias in not taking it upon himself to order severance. There were clearly reasons why the two defendants should have been tried together. The decision to go forward with a joint trial was

clearly that of the appellant Spease and his trial counsel. The judge, for all he knew, might well have been doing Spease harm in ordering a severance in the face of that decision.

### Conflict of Interest by Defense Attorney

The appellant Spease, again speaking for himself alone, urges that he was denied the effective representation of counsel because of a conflict of interest in the same attorney's representing both Spease and Ross. The short answer to this contention is that the point was not raised below and that there is nothing before us preserved for appellate review. Maryland Rule 1085. We note, moreover, that neither Ross nor Spease took the stand in their own defense and no conflict between their positions is remotely suggested. Their joint defense attorney cross-examined George Bowens so effectively that the judge instructed the jury to disregard his testimony. The key State's witness was Detective Snow and the key piece of evidence was the intercepted telephone conversation between Spease and Ross on December 21. Counsel made every conceivable effort to attack the interception order and the manner of its execution. With respect to it, Spease and Ross clearly rose or fell together. We see no merit in the contention.

### Sufficiency of Evidence

Both appellants urge upon us the legal insufficiency of the evidence to sustain the conviction for conspiracy to distribute cocaine. Evidence established a pattern of both Spease and Ross taking rooms at the Colony 7 Motel in Anne Arundel County on a number of occasions. On December 21, 1971, Ross placed a call from his home to the Colony 7 Motel. He informed the motel operator that he wished to speak with Willie Ross (notwithstanding the fact that he was Willie Ross). The motel operator then connected him with the room which had been taken in the name of Willie Ross. Spease answered the .phone. The following conversation transpired:

"Mr. Spease stated: 'I got that thing.'

Mr. Ross: 'Good.'

Mr. Spease: 'I found it, rather.'

Mr. Ross: 'Good.'

Mr. Spease: 'I ain't cut 'em. They're at 6 and 3.'

Mr. Ross: 'Huh? '

Mr. Spease: 'I've got 6 dolls and 3 of them.'

Mr. Ross: 'So what did he say about it? '

Mr. Spease: 'Huh? '

Mr. Ross: 'So what did he say about it? How long will it be before you will be over here? '

Mr. Spease: 'About one-half an hour. I got something for us.'

Mr. Ross: 'Huh? '

Mr. Spease: 'For us though.'

Mr. Ross: 'Yeah. Crazy has been calling all night.'

Mr. Spease: 'Oh Lord. Did you call him yet? '

Mr. Ross: 'He been calling me all night because they took Soles off bond.'

Mr. Spease: 'Uh huh. I went by and Raymond was telling me.'

Mr. Ross: 'Yeah.'

Mr. Spease: 'He said you had been looking for me to try to get Soles out on bond but I figured you had better connections than me of getting him out.'

Mr. Ross: 'Rocky must have forfeited his bond.'

Mr. Spease: 'Yeah.'

Mr. Ross: 'They're going to put up $1,500 cash on somebody's house.'

Mr. Spease: 'Uh huh.'

Mr. Ross: 'If this shit is right, I'm going to tell him something.'

Mr. Spease: 'You damn right.'

Mr. Ross: 'That boy ain't never been late for Court. He got a home up for the kitty.'

Mr. Spease: 'Huh? '

Mr. Ross: 'Pumpkin's got his house up.' "

Detective Snow, whose expertise was amply established, testified that the two sentences of Spease from the motel, "I got that thing," and "I found it, rather," indicated that he had located the "stash" of illicit narcotics at the designated "drop-off" place. "Dolls" referred clearly, according to Detective Snow, to units of cocaine. The sentence, "I've got 6 dolls and 3 of them," meant that Spease had recovered from the "drop-off" point 6 units (the amount in each unit was not clear) of cocaine and 3 units of some other narcotic. The sentence, "I ain't cut 'em," indicated that they were still of wholesale strength and needed to be adulterated further with milk sugar and quinine before being ready for street sale. The sentence, "I got something for us," was a reference, according to Detective Snow, to some unusually high-quality drug that Spease and Ross would enjoy for their own consumption. Ross then indicated, "Crazy has been calling all night." "Crazy" was identified as Joyce Jones, otherwise known as Stud Broad Joe, otherwise known as Stud Joe, a well-known wholesaler of narcotics in Washington, D.C., with extensive contacts in Prince George's County. Bowens had already testified that Joyce Jones had at one time been his contact for cocaine. "Crazy" was concerned "because they took Soles off bond." Soles was Charles Calvin Soles, convicted on that very day by Judge Ralph Powers in the Circuit Court for Prince George's County for possession of $32,000 worth of cocaine.[9]

The "Raymond" referred to by Spease was Raymond Nichols, a brother-in-law of Spease and the man who had

9. Soles was what is known in the trade as "a camel," a transporter of illicit cocaine. See *Soles v. State*, 16 Md. App. 656, 299 A. 2d 502. Although Soles' crime for which he was convicted occurred on September 19, 1971, apparently he continued to transport cocaine right up to the last day of his trial. The indications are that he had ferreted away a supply of cocaine. When Judge Powers suddenly and unexpectedly revoked his bond in the middle of the trial, everyone was thrust into a quandary over the hidden drugs.

gone with Bowens to Ross's apartment on December 17 to exchange stolen goods for cocaine.

Bowens had also testified that he and Raymond Nichols had received cocaine from Ross on December 17 and that he (Bowens) had also purchased cocaine from Ross on December 21.

In a jury trial, the test as to whether the evidence was sufficient in law to permit the trial judge properly to deny the appellant's motion for a judgment of acquittal and to submit the case to the jury is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331. We are persuaded that the evidence was legally sufficient here to permit the conspiracy charge to go to the jury against both appellants.

### Trial Rulings: Opening Statement of Prosecutor

The appellants object to three rulings made by Judge Mathias during the course of the trial. In opening statement, the Assistant State's Attorney indicated that he would prove that "Mr. Ross, and to a lesser extent Mr. Spease, were deeply involved back in December, 1971, in the wholesale distribution of cocaine" and that "the Colony 7 is used as a drop-off point for cocaine coming from New York." Later, alleging that the State's evidence had not directly established either allegation, the appellants moved for a mistrial. The motion was denied. Although the State may optimistically have promised more than it ultimately delivered, the difference was simply one of degree and there was, in any event, no evidence of bad faith. The rule in this regard is stated in *Ott v. State,* 11 Md. App. 259, 266, 273 A. 2d 630:

> "An opening statement is not evidence and to secure a reversal the accused is usually required to establish bad faith in the statement of what the

prosecution expects to prove or substantial prejudice resulting therefrom. *Clarke v. State,* 238 Md. 11."

Judge Mathias, moreover, specifically instructed the jury:

"The court advises you that opening statements of attorneys is not evidence, the closing argument of attorneys is not evidence. The evidence on which your decision shall be made is the testimony which the court permitted to be presented and the exhibits which the court has permitted to be admitted in this case, keeping in mind the court's instructions as to Bowen's testimony on the counts which are not left in the case."

We see no error.

### *Trial Rulings: Closing Argument of Prosecutor*

In his closing argument, the Assistant State's Attorney read at some length from the opinion of this Court in *Peterson, Deal and Hunt v. State, supra,* emphasizing our recitation there of the established expertise of Detective Snow. The appellants objected and the court overruled the objection. Although it is improper to read from appellate decisions for the facts contained therein, rather than the law contained therein, the Maryland rule is that reversal will not be justified unless the jury was actually misled or was likely to have been misled or influenced by the references. *Reidy v. State,* 8 Md. App. 169, 259 A. 2d 66. In view of the clear instruction of Judge Mathias that nothing said in opening statement or closing argument was to be considered as evidence, and in view of the demonstrated expertise of Detective Snow brought out on the face of the present record, we are persuaded that any error was harmless. The situation here does not remotely resemble that which we dealt with in *Howard v. State,* 19 Md. App. 673, 313 A. 2d 567.

### *Trial Rulings: Extraneous Evidence as to Spease*

The appellant Spease claims that extraneous evidence,

particularly the testimony of Bowens as to events of December 17 and the sale of cocaine on December 21, should not have been admitted against him, even though it may have had relevance in the case against Ross. The short answer is that Spease raised no objection and that there is therefore nothing before us which has been properly preserved for appellate review. Maryland Rule 1085. We note, moreover, that all of the evidence tended to establish the *modus operandi* of the conspiracy and to shed interpretive light on what might have been the otherwise ambiguous conversation of December 21.

## The Pre-Sentence Report

The appellants, primarily Ross, finally object to the extensive use made by Judge Mathias of the full and meticulously prepared pre-sentence report. The contents of the report were discussed at great length. Counsel for the appellants was given full opportunity to review it and to refute anything contained therein. The record indicates that Ross himself reviewed the report. His counsel responded affirmatively on the record, "There are no factual errors as to the facts."

The law is clear that a judge has "wide discretion in determining what sentence to impose. It is also true that before making that determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U. S. 443, 446, 92 S. Ct. 589, 30 L.Ed.2d 592, 596 (1972); *Towers v. Director*, 16 Md. App. 678, 681, 299 A. 2d 461.

Judge Mathias here quite properly attempted to assess where Spease and Ross stood in the criminal hierarchy dispensing illicit drugs in Prince George's County. The investigation was revealing. The record revealed the sales of $900 worth of heroin and $500 worth of heroin to the government undercover agent in May and June of 1971. The investigation also revealed that that agent was shot on July 13, 1971. It was further revealed that one Hoseby, who was

subsequently convicted of that offense, was arrested at Ross's home. Hoseby was a well-known "contract" or "hit" man. The investigation also revealed that on two occasions after the current arrest, Ross had made serious threats on the life of Detective Snow, on one occasion stating, "Snow, whether you know it or not, this is not a threat, it is a promise, some day, if I don't get you, one of the young dudes from up on the hill will." Investigation revealed that Ross was one of the "biggest drug wholesalers in the Metropolitan area." Ross was described as being considered by those in the narcotics traffic as "an untouchable; the people involved in drugs can't believe that Willie Ross fell."

The sources of the information in the pre-sentence report as to both Ross and Spease were fully and meticulously set out. Appellants had every opportunity to refute the information and could not effectively do so. We think that the information was properly considered by Judge Mathias and that there was nothing improper in the sentences he meted out.

*Judgments affirmed; costs to be paid by appellants.*